## Case No. 3,790.

### DENNEY v. ELKINS.

[4 Cranch, C. C. 161.] [1]

Circuit Court, District of Columbia. May Term, 1831.

WAGERS—VALIDITY OF NOTE FOR ELECTION BET.

An action cannot be maintained upon a promissory note given upon a wager that A. J. would not obtain the electoral vote of the state of Kentucky for the office of president of the United States, the consideration being illegal, although the parties themselves were not qualified to vote at the election: and because such a *contract tends to draw in question the validity* of the election of the chief magistrate of the nation.

[Cited in Fleming v. Foy, Case No. 4,862.]

This was an appeal from the judgment of a justice of the peace given against the appellant [John R. Denney] upon a promissory note to the appellee [Jere Elkins], upon a wager that Andrew Jackson would not have

[1] [Reported by Hon. William Cranch, Chief Judge.]

the electoral vote of Kentucky for the office of president of the United States.

Mr. Wallach, for appellant, contended that the consideration was illegal, and cited Bland v. Collett, 4 Camp. 158, note; Lansing's Case, 8 Johns. 454; Bunn v. Riker, 4 Johns. 426; Vischer v. Yates, 11 Johns. 23; Atherfold v. Beard, 2 Term R. 615; Cotton v. Thurland, 5 Term R. 405; Lacaussade v. White, 7 Term R. 535.

Mr. Coxe, for appellee, cited Denniston v. Cook, 12 Johns. 376; Allen v. Hearn, 1 Term R. 56; Andrews v. Herne, 1 Lev. 33; and Yates v. Foote, 12 Johns. 12.

CRANCH, Chief Judge, delivered the opinion of the court (nem. con.).

This is an appeal from the judgment of a justice of the peace in a suit brought by the appellee against the appellant upon a promissory note given by the appellant to the appellee, upon a wager that Andrew Jackson would not obtain the electoral vote of the state of Kentucky for the office of president of the United States. The note was made in the District of Columbia, in October, 1828, and before the electoral vote was given; the appellee and the appellant being, at the time of the wager, both residents and citizens of the District of Columbia, and neither of them having a right to vote in the election of electors for president in any part of the United States. It is objected that the note is void, because the wager was illegal, as being contrary to the principles of public policy upon which our elective governments are founded. If the parties, or either of them, had been qualified to vote at the election, it is clearly settled that the wager could not be enforced by a court of law. The only doubt, in this case, arises from the fact that neither of the parties was qualified to vote at that election. It is contended that the reasons, given by the courts which have decided such wagers to be illegal, rest mainly on the ground that one of the parties, at least, was a legal voter. There is a case cited in the books, from 1 Lev. 33 (Andrews v. Herne), where a wager was laid "that Charles Stuart would be king of England within twelve months next following," he being then in exile. After verdict for the plaintiff, it was moved in arrest of judgment, that there was no consideration; for he was king of England at the time of the promise. But the court said that the consideration was good; for the words must be taken according to the subject-matter; and that being out of possession at the time of the promise, it must be understood to be, that if the king shall be in possession within twelve months. No objection was made that it was against public policy, nor was any intimation of such an objection made by the bar or the bench. It is therefore a case not at all applicable to the present question. unless the absence of the objection may be considered as an argument against

its validity. But Mr. Justice Buller, in Good v. Elliott, 3 Term R. 697, said he presumed no one would say that an action could now be maintained on any bet of that kind. The principle, that a wager against public policy is void, has been since conclusively established; and the question now, in all these cases, is whether the circumstances of the case bring it within the general principle. In the case of Jones v. Randall, Cowp. 39, A. D. 1774, Lord Mansfield said, "Many contracts which are not against morality are still void, as being against the maxims of sound policy." But, in considering whether the wager in that case, (which was, "whether a decree of the court of chancery would be reversed on appeal to the house of lords,") was void because contrary to the principles of morality, he puts the case of a person who was a candidate for a bishopric laying a wager, with a person of great influence at court, that he would not have the bishopric. So he says that if, in the case then before the court, the wager had been made with one of the judges, or one of the lords, it would have been a bribe; or even if it had been a wager laid with the attorney or counsel in the cause. The court was of opinion, that the wager was neither against morality nor public policy. But, in delivering the opinion of the court, Lord Mansfield said, "But it is argued, and rightly, that notwithstanding it is not prohibited by any positive law, nor adjudged illegal by any precedents, yet it may be decided to be so upon principles; and the law of England would be a strange science indeed if it were decided upon precedents only. Precedents serve to illustrate principles, and to give them a fixed certainty. But the law of England, which is exclusive of positive law enacted by statute, depends upon principles; and these principles run through all the cases according as the particular circumstances of each have been found to fall in with the one or the other of them." The case of Allen v. Hearn, 1 Term R. 56, was upon a wager between two voters with respect to the election of a member of parliament. The bet was made before the poll began. This wager was adjudged illegal, as being against public policy. The case of Jones v. Parry, cited in 1 Term R. 58, 59, was a bet upon the Bristol election, and was tried before Lord Mansfield at Guildhall. There it did not appear whether the parties were voters or not; for the moment Mr. Wallace had opened the case, Lord Mansfield thought it was a color for bribery, and nonsuited the plaintiff. In the case of Allen v. Hearn, 1 Term R. 59, Lord Mansfield said, "Whether this wager had any other motive than the spirit of gaming and the zeal of both parties, I do not know; but this question turns on the species and nature of the contract; and if that, in the eye of the law, is corrupt and against the fundamental principles of the constitution, it cannot be supported by a court of justice. One of the principal foundations of this constitution depends on the proper exercise of this franchise; that the election of members of parliament should be free; and particularly that every voter should be free from pecuniary influence in giving his vote." The case of Atherfold v. Beard, 2 Term R. 610, was upon a wager, whether the Canterbury collection of the duties upon hops in 1786 would exceed that of 1785. In that case, Mr. Justice Ashhurst said, "Now I am of opinion that the present case falls within the principle of those which have been determined not to be good. The courts have said that wagers should not be allowed which, in the event, may have an influence upon the public policy of the kingdom. On this principle, a wager on the event of an election for members to serve in parliament was held to be illegal, because the persons laying the wagers were interested in altering the free course of election. The present wager, also, appears to me to fall under the same class of objection, because it is against the same policy of the kingdom. The plaintiff's counsel have admitted that the officers of excise were not bound to produce the public books. Now that goes the whole length of determining this cause; for if the wager be such that the best evidence by which it must be proved is improper to be admitted, that circumstance shows that the wager is in itself illegal." Mr. Justice Buller, in the same case, said, "This is the case of an idle wager between two persons who have no concern in the subject, to draw into question a matter that respects the interest and general importance of the country; and on that ground I think the wager illegal. I do not find that it has been established as a position of law, that a wager between two persons not interested in the subject-matter, is legal. But this wager could not be proved without searching the books relating to the revenue of the country; and I am glad to find that in the only two cases where this question has arisen at nisi prius, Lord Mansfield and my Brother Ashhurst, were both of opinion that the officers were not bound to produce the revenue books." It may be observed, that although in that particular case (Atherfold v. Beard) the defendant had confessed that he had lost the wager, and, therefore, it was not necessary to produce the revenue books in evidence, yet, as the books would have been the best evidence, and must have been produced to support the action, if the fact had not been admitted by the defendant, and as public policy prohibited the production of those books, the court thought that circumstance conclusive of the illegality of the wager. It was observed, also, by Mr. Justice Buller, that "what Lord Mansfield said in the case of Murray v. Kelly was applicable, when he said that that wager was good because it was on a private event; from whence it is to be inferred that, in his opinion, it would have been void had it been on a public event."

The principle, upon which the case of Atherfold v. Beard was decided, was, that the wager was against the public policy of the kingdom; and it was against the public policy because it brought into discussion, in a judicial tribunal, at the will of individuals having no particular interest in the subject, matters concerning the public revenue which the government might think it improper to disclose, and which could only properly be discussed in parliament, and required the production of evidence which could be properly called for by parliament only. In the case of Good v. Elliot, 3 Term R. 699, Mr. Justice Buller said, "I take it to be agreed by my brethren, from whom I have the misfortune to differ, that if the wager concern the interest of the public, or impute a crime or disgrace to another person, it is void, and cannot be made the subject of an action." And on page 700 he says, "It is established, that if the action lead to improper inquiries, it may be stopped in limine." The same point was afterward adjudged by the common pleas in Shirley v. Sankey, 2 Bos. & P. 130.

In the case of Lacaussade v. White, 7 Term R. 535, the wager was whether articles forming the basis of a treaty of peace between England and France, would not be signed before the 11th of September, 1797; and it was admitted that the wager was illegal; and no doubt on the same ground. In Bunn v. Riker, 4 Johns. 426, the wager was between two voters, Riker and Graham, upon the event of the election of governor of the state of New York. Riker had voted the day before the wager; Graham had not, and probably was too far from the place where he was entitled to vote at that election. The defendant, Bunn, was the stakeholder. Riker, the plaintiff, was the winner of the wager. This wager was adjudged illegal upon the ground that it was against the principles of sound policy, because it involved an inquiry into the validity of the election of the chief magistrate Judge Van Ness observed, "It is enough that this wager may give birth to such a question, to pronounce it to be repugnant to the dictates of good policy. The discussion, to which it gives rise, ought to be discouraged, unless the public good, or the due administration of justice, renders it unavoidable. It is a discussion calculated to endanger the peace and tranquility of a community already sufficiently heated and agitated." The wager was also decided to be against sound policy because it created a corrupt interest in the voters themselves. Judge Spencer, however, although he admitted that a wager against public policy is void, did not concur in the opinion of the court, that that wager was against public policy; because he thought that it could not bring into question the validity of the election, since the statute renders the decision of the canvassers conclusive and final; and because, as Riker had already voted, and Graham was

not in a situation where he could exercise his right of voting, the vote of neither could be influenced by the wager. The principle of that case was confirmed in the case of Lansing v. Lansing, 8 Johns. 454, where the wager was upon the election of governor of New York, after the close of the poll; and each party deposited his note with a third person. After the event was known, the notes were delivered to the winner, who indorsed to the plaintiff the defendant's note after it was payable. The court said, that the case was within the principle decided in Bunn v. Riker, that a bet involving an inquiry into the validity of the election of governor, was void, on principles of policy, and reversed the judgment which had been rendered below for the plaintiff. In the case of Vischer v. Yates, 11 Johns. 23, the action was against the stakeholder, to recover the money deposited by the plaintiff in a wager upon the election of governor. After the event of the election was generally known, but before the money was payable according to the terms of the wager, the plaintiff gave notice to the defendant not to pay over the money. The court sustained the action, upon the ground that the wager was against the principles of public policy. In that case, the bet was made before the election, and all the parties were legal voters at the time of the election.

Kent, C. J., in delivering the opinion of the court, said, "In this case, the parties referred to the decision of the canvassers as the true and only test of the determination of the bet; and that test had not been given when the money was demanded of the defendant; the risk had not been run, and determined within the purview of the contract. This objection, however, was founded upon a strict construction of the contract; and, though it would be sufficient to avoid much of what was urged on the part of the defendant, yet we choose rather to place the decision of this case upon those great and solid principles of public policy which forbid this species of gambling, as tending to debase the character and impair the value of the right of suffrage." Although the judgment in that cause was reversed in the court of errors and appeals, yet it seems, by the opinion of the only senator whose opinion is reported, that it was upon the ground that the plaintiff, by depositing the money in the hands of the stakeholder, had executed the illegal agreement on his part, and could not recall it, because "in pari delicto melior est conditio possidentis;" and "fieri non debet, sed factum valet."

The general principle, running through all the cases, is, that a contract, which it would be contrary to the maxims of sound public policy to enforce, is void at law. It is one of the maxims of sound public policy in all elective governments, that elections should be pure and free. Any contract which would tend to substitute a corrupt for a pa-

triotic motive to influence a vote either directly or indirectly, would be contrary to that maxim. It is not necessary that it should operate directly as a bribe to a voter. If it create a contingent pecuniary interest, dependent upon the event of the election, it operates as a corrupt motive to influence that election; and whether the influence of the party be more or less, the violation of the principle is the same, and equally affects the validity of the contract. It is the nature and tendency of the contract, not the degree of mischief which it may effect, that decides its validity. Although the parties may not be qualified voters, yet their means of influencing the election may be very great. They may form themselves into clubs or committees, and by exciting the passions, by holding up the promise of their influence in obtaining offices for those who seek them, or by denouncing those already in office; by circulating false reports, by hiring writers and printers to extol their candidate and slander his opponent, and by many other means, may have actually as much influence in the election as if they were, themselves, qualified voters. The maxim, being founded on the tendency of the contract to produce the public mischief, must be as extensive in its operation as the mischief itself. This is one great advantage which common law has over statute law, that being bottomed upon the mischief, it follows it through all its forms; whereas statute law is confined to the cases which it describes. So far as the influence used in an election is prompted by a pecuniary motive, so far it is corrupt, and in violation of the maxim, that elections should be pure. No vote can be perfectly pure which is not given exclusively with a view to the public good. Nor can the use of corrupt means be justified by the belief of him who uses them, that the end is the public good. We are, therefore, of opinion that the contract in question was contrary to the maxims of the public policy upon which our elective government is founded, and, therefore, void in law, although the parties themselves were not qualified to vote at the election.

There is another principle of public policy also, which may, perhaps, render this contract void; namely, that it tends to draw into question, in a judicial tribunal, the validity of the election of the chief magistrate of the nation, and to require the production of evidence which it might be inconvenient, if not improper, for the government to furnish. Upon this point, however, the court is not so clear. and, therefore, rests its decision mainly upon the tendency of such contracts to introduce corruption into our elections. The judgment must be reversed, with costs.