MADELAINE ROTH

*v.*

AMALIE STAEHLE ROTH *et al.*

*Filed at Ottawa May 12, 1882—Rehearing denied September Term, 1882.*

1. CONFLICT OF LAWS—MARRIAGE AND DIVORCE—*marriage in this State of foreign born persons.* A marriage solemnized in this State between subjects of a foreign country domiciled here at the time, in strict conformity with our laws, and between parties competent under our laws to contract the

relation, is valid and binding here, notwithstanding such marriage is in violation of the positive law of the country of which they are subjects.

2. SAME—*acquiring domicile in the foreign country after a valid marriage here—effect of foreign decree annulling the marriage—as to subsequent rights of the parties in this State.* A marriage in this State of subjects of a foreign country, valid by our laws, upon the return of the parties to their own country, and their acquiring a new domicile there, may be annulled by the proper courts of such foreign country in accordance with its own laws, for causes not recognized by our laws.

3. A subject of the king of Würtemberg, while domiciled in this State, entered into the marriage relation in strict accordance with the laws of this State, but in violation of an ordinance or law of the kingdom of Würtemberg, declaring all such marriages in a foreign State, without the license of the sovereign, absolutely null and void. After the return of the parties to that kingdom, and they had acquired a domicile there, a suit was brought by the husband to annul and declare the marriage void, and the proper court, having jurisdiction by the laws of that country of the subject matter and of both parties, rendered a decree declaring the marriage absolutely null and void, the effect of which there was not only to establish the nullity of the marriage, but also to annul and terminate the *status* of the parties arising from a *de facto* as well as a *de jure* marriage: *Held,* that such decree was conclusive upon the late wife in this State, and deprived her of all rights as widow or heir of her former husband.

4. SAME —*"marriage and inheritance contract" made in a foreign country—of its effect as a transfer of title in this State.* A "marriage and inheritance contract" between a husband and wife, after their marriage in the kingdom of Würtemberg, confirmed by the proper court of that country, whereby each was to hold the property belonging to him or her during their joint lives as common property, with right of survivorship, will not, upon the death of the husband, pass the legal title of his real estate in this State to his widow, but such agreement, on his death, operates as an equitable assignment of the estate to the widow, which may be enforced in a court of equity.

5. SAME—*citizens or subjects in a foreign country—how far affected by laws of their home government.* Every State has the power to enact laws which will personally bind its citizens or subjects when sojourning in a foreign jurisdiction, provided they in terms profess to so bind them. It is true, such laws have no extra-territorial effect, so as to authorize their enforcement in a foreign country; but upon the return of the parties violating them, they may be enforced in the same manner and to the same extent as if their infraction had occurred in the State enacting them.

6. SAME—*status of the individual on a change of domicile.* Ordinarily when a person, upon a change of domicile, goes into another State or country, the personal *status* which he carries with him will be recognized by the courts

of the latter country; but this rule is subject to certain exceptions. If, for instance, such *status* has been acquired by a violation of an express provision of the positive law of the State in which its recognition is asked, or if it be contrary to the spirit and genius of its institutions, as a title of nobility would be here, or if it is opposed to its settled policy, or to the good order and well being of society, or to public morality and decency, in all such cases the *status* will not be recognized by the courts of the latter State.

7.   FOREIGN JUDGMENT—*how far conclusive on the parties here.* Where the court of a foreign country has jurisdiction of the parties and subject matter of a suit, and this affirmatively appears, its judgment or decree will be conclusive on the parties, their legal representatives and privies, in all countries where the matters litigated are again drawn in question; and this is particularly so with respect to judgments or decrees affecting the *status* of a person, they being in the nature of judgments *in rem,* which are binding on the whole world.

8.   The limitation to this rule is, that it may be shown such judgment or decree was obtained by means of fraud, or gross abuse of the process of the court, or flagrant departure from the ordinary course of judicial procedure, as, for instance, that a party in interest sat as a judge in the cause.

9.   FRAUD—*general allegation not sufficient.* It is not sufficient for the purpose of successfully assailing a transaction on the ground of fraud, to charge fraud generally, but the complaining party must state in his pleading and prove on the trial the specific acts or facts relied on as establishing fraud.

APPEAL from the Superior Court of Cook county; the Hon. JOHN A. JAMESON, Judge, presiding.

The record in this case shows that John George Roth, a subject of the kingdom of Würtemberg, came to this country, and settled in Chicago at an early day, and there accumulated a large amount of property, consisting chiefly of real estate, which is the subject of controversy in this suit; that in 1855 he married, in Chicago, Madelaine Moser, a native and subject of France, who had a short time before accompanied him on a return visit from that country to this; that in 1856 they returned to Europe, and on their arrival in that country, or shortly afterwards, owing to certain difficulties and misunderstandings, a separation took place, resulting in her returning to reside with her father, in Alsace, France, her

former domicile and residence, and in his establishing a new residence in Schorndorf, in the said kingdom of Würtemberg, where he continued to reside until the time of his death, which occurred on the 12th of July, 1876; that in 1862 his wife returned to this country and instituted proceedings for a divorce, where she was shortly afterwards followed by her husband, and through his influence induced to abandon the divorce suit and return with him to Schorndorf, where they again resumed marital relations, which were continued until October, 1870, when he commenced legal proceedings in the proper court, at their domicile in Würtemberg, to procure a decree of nullity of their marriage on the ground it had been entered into on his part in violation of the laws of the kingdom of Würtemberg, of which he was at that time a subject; that on the 24th of April, 1873, the cause was brought to a final hearing, both parties being present, and represented by their respective counsel, resulting in a decree declaring the marriage a nullity, on the ground just stated; that the court in which the decree was rendered had jurisdiction, both of the parties and the subject matter of the suit, and under the laws of Würtemberg had full power and competent authority to enter the decree; that on the 9th of September following, in consideration of $8000 in United States bonds paid to her by Roth, Madelaine, his former wife, released to him all her interests, whatever they might be, in the property in controversy; that on the 27th of November following, Roth contracted a second marriage with Amalie Staehle, who now claims the estate in controversy; that after the marriage of Amalie and Roth, on the 28th of March, 1874, they entered into an agreement known to laws of Würtemberg as a "marriage and inheritance contract," by which it was provided they were to hold the property belonging to them respectively during their joint lives as common property, with the right of survivorship to the longer liver, subject to the payment of their debts, the education and marriage portions of their

children, and to the payment by her, in the event she survived him, of certain legacies to his relations, amounting altogether to 80,000 florins, which contract was duly approved and confirmed by the proper court of that country; that immediately before his death, and with a view of enabling his wife to carry out the contract just mentioned, Roth conveyed, or attempted to convey, the property in controversy to her brother, Albert Staehle, but that whatever interest passed by it was subsequently reconveyed by him to Amalie; that after Roth's death, on the 25th of September, 1876, Madelaine visited Schorndorf, and while there spent much of her time with Amalie, and accepted of her various presents, etc.; that on the 26th of the same month, Madelaine, in consideration of 10,000 marks, released to Amalie all claims to and upon her late husband's estate, and on the 3d of October following, executed to her a deed to the property in controversy; that Roth, at the time of his death, left no child or children, or descendants thereof.

Under these circumstances, in 1878, the present bill was filed by Madelaine, in the Superior Court of Cook county, against Amalie and the heirs at law of Roth, in and by which she claims that the marriage between her and Roth was a legal and valid marriage; that the decree of the Würtemberg court, and all the proceedings upon which it is based, were and are null and void, and that she is therefore the lawful widow and heir of her said husband, and as such entitled to a partition and division of his estate, under the statute. Amalie answered the bill, and also filed a cross-bill, setting up the facts above recited, and relying on them to establish her rights, as the survivor and lawful widow of Roth, to the property in dispute. A cross-bill was also filed by the heirs of Roth, setting up their rights in the premises. The court found the equities with Amalie upon her cross-bill, and entered a decree dismissing the original bill, and directing the heirs of Roth to be paid the amount due them under the

"marriage and inheritance contract." That decree has been performed as to the heirs of Roth, and Madelaine Roth alone brings the case by appeal to this court for review.

Mr. C. M. Harris, for the appellant:

Penal laws are strictly local, and those of one country can not be regarded in another. *Folliott* v. *Ogden*, 1 H. Bl. 135; *Ogden* v. *Folliott*, 3 Term, 733; *Warrender* v. *Warrender*, 3 C. La. & Fin. 538; *Commonwealth* v. *Green*, 17 Mass. 548; Story's Const. 16, secs. 91, 104; Dicey on Domicile, 160.

Statutes restricting the liberty of marriage are penal. *Hodgkinson* v. *Wilkheir*, 1 Hagg. Const. 262.

That the validity of a marriage depends on the law of the country where it is celebrated, see Bishop on Marriage and Divorce, sec. 371; *Dalrymple* v. *Dalrymple*, 2 Hagg. Con. 54, 4 Eng. Ecc. 485; *Ruding* v. *Smith*, id. 371, id. 551; *Middleton* v. *Janverin*, id. 437, id. 582; *Scrimshire* v. *Scrimshire*, id. 385, id. 565.

A foreign decree has no extra-territorial force, save through comity. Woolsey on International Law, sec. 75; Story's Conflict of Laws, 603–607.

If it conflicts with reason and justice, or if the court has proceeded upon false premises or inadequate reasons, or mistake of local or foreign law, it will not be enforced elsewhere. *Simonin* v. *Mallac*, 2 Sw. & Tr. 67; *Simpson* v. *Fogo*, 32 L. J. Ch. 249; Parsons on Contracts, 606; Wharton on International Law, 747; *Don* v. *Lipman*, 5 Cl. & Fin. 20; *Novelli* v. *Rossi*, 2 B. & Ad. 757; *Reimers* v. *Druce*, 23 Beav. 145.

Such decree will not be enforced when it will directly or indirectly give effect to an act which infers a scandal on society or a breach of national morals and decency, or when it would be detestable or pernicious, as, the enforcement of a contract with a prostitute for her prostitution, although valid when made. *Birthwhistle* v. *Vardill*, 5 B. & C. 455; *Fenton*

v. *Livingstone*, 3 Macq. 537; *Bank of Augusta* v. *Earl*, 13 Pet. 518; *Greenwood* v. *Cartes*, 6 Mass. 358.

A marriage settlement made in a foreign country does not of itself affect real estate here, and can, if at all, only by suit under the laws of this State.   73 Ill. 285; 15 La. Ann. 317.

Executory contracts do not transmit title.   *Olney* v. *Howe*, 89 Ill. 556.

An executory agreement, or imperfect conveyance upon a merely voluntary consideration, will not be enforced or aided in equity.   64 Ill. 548; 1 White & Tudor's Leading Cases, 420, 427; 1 Select Cases, (Ala.) 535.

Messrs. ROSENTHAL & PENCE, for the appellee Amalie S. Roth:

Where a contract to marry is executed, its nature as a contract is merged in the higher nature of a *status*, and the contract no longer exists.   This *status* travels with the spouses wherever they go, and becomes subject to the laws of the State where the parties may become domiciled, and is there under control of the sovereign power.   1 Bishop on Marriage and Divorce, secs. 3, 667; Story's Conflict of Laws, secs. 228–230; *Barber* v. *Root*, 10 Mass. 265; *Strader* v. *Graham*, 10 How. 82; *Maguire* v. *Maguire*, 7 Dana, 181; *Cheever* v. *Wilson*, 9 Wall. 108; *Harrison* v. *Harrison*, 19 Ala. 499; *Harvie* v. *Farnie*, L. R. 5 P. D. 153; 43 L. T. R. 738:

It is clearly competent for every nation to say that certain marriages of its subjects or citizens shall be invalid, wherever they may be contracted.   Story's Conflict of Laws, secs. 114 d, 117; Foote's Priv. Int. Jur. 272, 273; 1 Burge on Colonial Law, 188, 195, 196; Wharton's Conflict of Laws, sec. 161; Lawrence's Wheaton, 172; 4 Phillimore's International Law, 29; Piggott's Foreign Judgments, 167, 168; Maxwell on Stat. 119; *Fenton* v. *Livingstone*, 5 Jur. N. S. 1183; 3 Macq. 497; *Sussex Peerage case*, 11 Cl. & F. 85; *Sottomayer* v. *De Barros*

L. R. 3 P. Div. 5; *Mette* v. *Mette*, 1 Sw. & Tr. 416; *Brook* v. *Brook*, 3 id. 481; *Warrender* v. *Warrender*, 2 Cl. & F. 529.

If an incapacity to marry exists in a State of which the parties are citizens or subjects, and if the marriage of persons possessing such incapacity is declared by the statute of their State to be null and void wherever the same may be contracted, and if such persons go to another State where such incapacity does not exist, and there marry, and then return to their own State, such marriage will be held null and void in the latter State. *Kinney's case*, 30 Gratt. 858; *Williams* v. *Oatis*, 5 Ired. 535; *State* v. *Kennedy*, 76 N. C. 251; *Dupree* v. *Boulard*, 10 La. Ann. 411; *Commonwealth* v. *Lane*, 113 Mass. 458; *Commonwealth* v. *Hunt*, 4 Cush. 49; *Medway* v. *Needham*, 16 Mass. 157.

Where, by the positive law, consent of government is required to marry, such want of consent will invalidate the marriage. *Sussex Peerage case*, 11 Cl. & F. 85; *Sottomayer* v. *De Barros*, L. R. 3 P. Div. 5; *Fenton* v. *Livingstone*, 5 Jur. N. S. 1183; Story's Conflict of Laws, sec. 114 d.

Every country must be permitted to judge of the policy of its own law, and to enforce the same. This is a maxim of international law. 1 Bishop on Marriage and Divorce, sec. 368; Story's Conflict of Laws, secs. 18, 19, 21, 22, 23, 25; Savigny, note a, 38, 40; *Bank of Augusta* v. *Earle*, 13 Pet. 518; *Cin. Mutual H. A.* v. *Rosenthal*, 55 Ill. 91; Wharton's Conflict of Laws, (2d ed.) secs. 65, 207.

The *status* of all persons is controlled by the law of the nation to which they belong, and in which they are domiciled. Westlake's Private International Law, p. 24, *et seq.* 80; Story's Conflict of Laws, secs. 223, 224, 228–230; Wharton's Conflict of Laws, secs. 211, 213, 220, 800; 1 Bishop on Marriage and Divorce, secs. 367–369; Guthrie's Savigny's Private International Law, 248; 2 Kent, 107, note; Hubback on Succ. 335; Bigelow on Estoppel, 159, 160; Piggott on Foreign Judgments, 167, 168; *Shaw* v. *Gould*,

L. R. 3 H. L. 56; *Kinnier* v. *Kinnier,* 45 N. Y. 535; *Hunt*
v. *Hunt,* 72 id. 228; *Barber* v. *Root,* 10 Mass. 260; *Cheever*
v. *Wilson,* 9 Wall. 108; *Strader* v. *Graham,* 10 How. 82;
*Dorsey* v. *Dorsey,* 7 Watts, 349; *Ditson* v. *Ditson,* 4 R. I. 87;
*Udney* v. *Udney,* L. R. 1 Scotch App. 441.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

In the view we take of this case we do not deem it neces-
sary to follow counsel in the wide range their exhaustive and
elaborate arguments have taken, but shall confine ourselves
to one or two of the topics discussed in the briefs, which we
regard as conclusive of the controversy, whatever may be our
views with respect to the other issues in the case.

So far as the marriage between Roth and Madelaine Moser
is concerned, we have no hesitancy in saying that for all
purposes, in this State, it was a legal and valid marriage,
notwithstanding Roth, at the time, was a subject of the king-
dom of Würtemberg, and had not obtained a license author-
izing such marriage from the sovereign of that kingdom, as
required by the laws thereof. As both the parties were domi-
ciled here at the time of its celebration, it is not important
to determine whether the validity of a marriage depends
upon the *lex domicilii* or the *lex loci contractus,* for whatever
conclusion might be reached upon that question, the result
would be the same, so far as this case is concerned. Both
laws being identical, if the marriage was in conformity with
either it must necessarily have been with the other also,
and as it seems to have been solemnized in strict conformity
with our statute regulating the subject, and as the parties
were manifestly competent, under our own laws, to contract
the relation, it follows, as before stated, the marriage was
valid and binding.

While this marriage was clearly valid here for all purposes
whatsoever, it does not follow that upon the return of the
parties to the country of their nativity, and of which they

were still subjects, it would or ought to be held equally valid there, for it is clearly settled by the decided weight of private international law, so called, that every State has the power to enact laws which will personally bind its citizens or subjects when sojourning in a foreign jurisdiction, provided such laws in terms profess to so bind them when thus circumstanced. It is true, such laws have no extra-territorial effect so as to authorize their enforcement in a foreign country, and may, therefore, so far as their execution is concerned, be said to remain dormant till the return of those violating them, when they will be enforced in the same manner, and to the same extent, as if their infraction had occurred within the State enacting them. Story on Conflict of Laws, secs. 114 d, 117, 244, 22; Wharton on Conflict of Laws, sec. 161; Lawrence's Wheaton, p. 172; 4 Phill. Int. Law, 29, sec. 34; Piggott on Foreign Judgments, 167, 168; Dicey on Domicile, p. 215; 1 Burge on Col. Law, 188, 195, 196; 1 Bishop on Marriage and Divorce, sec. 368; *Sussex Peerage case*, 11 Cl. & Fin. 85; *Brook* v. *Brook*, 9 H. L. Cases, 193; *Fenton* v. *Livingston*, 3 Macq. 497; *Mette* v. *Mette*, 1 Sw. & Tr. 416; *Van Voorhis* v. *Brintnall*, 86 N. Y. 18; *Commonwealth* v. *Lane*, 113 Mass. 458.

Nor does it follow the *status* or relation created by the marriage could only be annulled by our own courts, or that it could only be annulled by other courts for such causes as would be recognized as sufficient for that purpose under our own laws. When the parties returned to Würtemberg and acquired a new domicile there, so far as their personal rights and relations are concerned our laws and government ceased to have any power over them or concern with them. Personally the State had no claims on them, and they owed it no allegiance or duty. *Barber* v. *Root*, 10 Mass. 260; *Hunt* v. *Hunt*, 72 N. Y. 228; *Kinnier* v. *Kinnier*, 45 id. 535; *Cheever* v. *Wilson*, 9 Wall. 108; *Ditson* v. *Ditson*, 4 R. I. 87; *Harvey*

v. *Farnie,* L. R. 5 P. D. 153; same case affirmed, L. R. 6
P. D. 35; Story on Conflict of Laws, secs. 211, 213; 1
Bishop on Marriage and Divorce, secs. 367, 368; Wharton
on Conflict of Laws, sec. 211; Guthrie's Savigny on Private
Internat. Law, p. 248. Whether the kingdom of Würtem-
berg, on their return and acquiring a new domicile there,
would recognize the *status* or relation which they had con-
tracted here, depended upon its own laws, and not upon ours.
That kingdom, in 1808, adopted an ordinance or law, which
was in full force at the time of the marriage in Chicago,
declaring all such marriages in a foreign State, without the
license of the sovereign, absolutely null and void. It was,
therefore, according to the general current of authority on
the subject, entirely competent for the courts of that kingdom
having jurisdiction of such matters, to give effect to that law
by annulling and setting aside the marriage, upon a proper
application for that purpose, which was done in this case.
1 Bishop on Marriage and Divorce, secs. 367, 368; Story on
Conflict of Laws, secs. 18, 19, 21–23, 25; Wharton on Con-
flict of Laws, (2d ed.) sec. 207; 4 Phill. on Int. Law, secs.
3, 11, 12, 13, 16, 24, 25; Guthrie's Savigny on Private Int.
Law, 248.

Ordinarily, where a party, upon a change of domicile, goes
into another State or country, the personal *status* which he
carries with him will be recognized by the courts of the latter
country. This is certainly the general rule, but it is subject
to certain well recognized exceptions. If, for instance, such
*status* has been acquired, as in the present case, by a viola-
tion of an express provision of the positive law of the State
in which its recognition is asked, or if it be contrary to the
genius and spirit of its institutions, as a title of nobility
would be here, or if it is opposed to its settled policy, or to
the good order and well being of society, or to public morality
and decency, in all such cases the *status* would not and should
not be recognized by the courts of the latter State. 2 Kent,

*p. 458; Wharton on Conflict of Laws, (2d ed.) secs. 207, 165; Story on Conflict of Laws, secs. 98, 244; 4 Phillimore on Int. Law, (ed. 1861,) p. 529; *Brook* v. *Brook,* 9 H. L. Cas. 193; *Cincinnati Mutual Health Ass.* v. *Rosenthal,* 55 Ill. 91; *Forbes* v. *Cochrane,* 2 B. & C. 448; *Mette* v. *Mette,* 1 Sw. & Tr. 416; *Commonwealth* v. *Lane,* 113 Mass. 458; *Van Voorhis* v. *Brintnall,* 86 N. Y. 18.

Assuming the compromises of appellant with Amalie and Roth, respectively, relating to her interest in the latter's estate, were made by her in ignorance of her rights, and that they were effected through the fraud and misrepresentation of them, and others acting in concert with them, as is claimed by her, of which we express no opinion, at least for the present, it follows the result of this case must depend chiefly upon the legal effect which must, under the circumstances stated, be given by the courts of this State to the decree rendered by the Würtemberg court annulling the marriage, and this we regard as the vital question in the case. The general rule unquestionably is, where it affirmatively appears the court of a foreign State has jurisdiction of the parties and subject matter of the suit, its judgment or decree will be conclusive on the parties, their legal representatives and privies, in all countries where the matters litigated are again drawn in question, and this is particularly true with respect to judgments or decrees affecting the *status* of a person, for they are in the nature of judgments *in rem,* which are binding on the whole world. Wharton's Conflict of Laws, secs. 800, 801, 802, 815, 816, 817, 822, 835; Bigelow on Estoppel, 170, 178; Freeman on Judgments, sec. 528; 2 Bishop on Marriage and Divorce, sec. 755; Foote on Private Int. Jur. 473, 474; Guthrie's Savigny on Private Int. Law, sec. 373, note c; *Harvey* v. *Farnie,* L. R. 5 P. D. 153; *Gould* v. *Crow,* 57 Mo. 200; *Rose* v. *Himely,* 4 Cranch, 162; *Hobbs* v. *Henning,* 17 C. B. (N. S.) 821; *Doglioni* v. *Crispini,* L. R. 1 Eng. & Irish App. 301.

The above rule is also fully recognized by this court. (*Baker* v. *Palmer*, 83 Ill. 568.) The limitation to this rule is, that it may be shown that such judgment or decree was obtained by means of fraud, or some gross abuse of the process of the court, or flagrant departure from the ordinary course of judicial procedure, as, for instance, that a party in interest sat as a judge in the cause. Foote on Private Int. Jur. 456, 472; 2 Story's Eq. Jur. sec. 1582; Piggott on For. Judgments, 116; Westlake on Private Int. Law, (last ed.) secs. 309, 310; *Crowley* v. *Isaacs*, 16 L. T. (N. S.) 529; *Ochsenbein* v. *Papelier*, L. R. 8 Ch. App. 695.

While it is claimed by counsel for appellant, in general terms, that the court rendering the decree in question acted without jurisdiction, and that the same was obtained by fraud, yet we fail to discover anything in the record to warrant either of these charges. It is not sufficient, as it has often been held by this court, for the purpose of successfully assailing a transaction on the ground of fraud, to charge fraud generally; but the complaining party must state in his pleading, and prove on the trial, the specific acts or facts relied on as establishing fraud. That has not been done in this case. So far as we are able to discover, the trial was perfectly regular, and conducted with the utmost fairness, and we see no ground to question the jurisdiction of the court. The depositions of persons learned in the law of that country have been taken in this cause, and they clearly show the several courts through which that case passed during its pendency, were, by the laws of that country, the proper tribunals to take cognizance of cases of that character in the manner it was done. And it is further shown that both parties appeared in the cause, by themselves and counsel. Hence, as before stated, we see no ground for questioning the jurisdiction of those tribunals. We are of opinion, therefore, the decree of nullity must be given in the courts here the same effect which would be given to it by the courts of the country

in which it was rendered. The effect of the decree there, as we understand it, was not merely to establish conclusively the nullity of the contract of marriage, or of the marriage itself, but also to annul and terminate the *status* or marital relation of the parties which arises from a *de facto* as well as a *de jure* marriage, so as to leave them in precisely the same condition as if no marriage had ever taken place between them. This being the effect of the decree there, it must be given the same effect here. *Barber* v. *Root,* 10 Mass. 260; *Ross* v. *Ross,* 129 id. 243; *Kinnier* v. *Kinnier,* 45 N. Y. 535; *Hunt* v. *Hunt,* 72 id. 228; *Harvey* v. *Farnie,* L. R. 5 P. D. 153; *Roach* v. *Garan,* 1 Ves. Sr. 159; *Collington's case,* 2 Swanst. 326, note; 2 Kent's Com. *p. 107; 2 Bishop on Marriage and Divorce, sec. 754; 1 id. secs. 354, note, 355; Wharton on Conflict of Laws, (2d ed.) secs. 1–3, 213, 671; Story on Conflict of Laws, secs. 37, 595, 597; 4 Phill. on Int. Law, (new ed.) secs. 836, 839; Freeman on Judgments, sec. 579; Foote on Private Int. Jur. 473, 474.

Such, then, being the legal operation of the decree, it follows that the appellant was not at the time of Roth's death his wife, either *de facto* or *de jure,* and hence she is not his widow, for no one answers that description who was not his wife at the time of his death, and consequently she has no right, as such, to succeed to his estate. (*Hood* v. *Hood,* 110 Mass. 463.) For the same reasons it follows that the subsequent marriage between Roth and Amalie was lawful and valid, and that relation having continued up to the time of his death, it results that she, and not appellant, is his lawful widow, and as such is entitled to his estate. It is true the "marriage and inheritance contract" did not, upon his decease, have the effect of clothing her with legal title to the real estate in controversy, as his survivor, as it doubtless would have done had the property been situated in the kingdom of Würtemberg instead of here; for it is not competent for parties, here or elsewhere, by mere agreement, to change

the manner of transferring real property in this State, but the agreement in question, upon his decease, operated as an equitable assignment of the estate to her, which was properly enforced by the decree in this case. Story on Conflict of Laws, secs. 143, 159, 184; Westlake on Private Int. Law, (new ed.) secs. 34, 35, 205; ibid. (old ed.) secs. 99, 371; *Decouche* v. *Savetier,* 3 Johns. Ch. 190; *Besse* v. *Pellochoux,* 73 Ill. 285.

Having reached the conclusion stated with respect to the decree of nullity, it is therefore unnecessary to discuss the effect of the compromise above alluded to, and relied upon as an estoppel by appellee. Whatever our views might be with respect to that matter, we are of opinion the law is with the appellee, on the grounds already stated.

*Decree affirmed.*

Mr. JUSTICE SCOTT: I do not concur in this decision.

Mr. JUSTICE WALKER, dissenting:

The parties were domiciled in this State when the marriage was consummated. Under our laws they were competent to enter into the contract, and they did in strict conformity to all of the requirements of the laws of this State, and it is on all hands conceded that it was valid according to our laws. All contracts lawfully made confer rights that must be enforced by our laws. Among the rights conferred by that contract was the right of the wife to dower in her husband's real estate, and to become his heir to one-half of the real estate of which he might die seized, leaving no children living, or descendants of such children. These were the vested rights she acquired by this contract, and she can not be divested of them by the contract being declared void but by the tribunals of this State. The foreign court had no power to construe and give authoritative judgment against the validity of contracts made under our laws, and

we are not bound by the decree of nullity. Had any court having competent jurisdiction granted a divorce, then by abrogating the marriage contract she would have lost her rights to dower and heirship, because the contract was destroyed in all of its parts, and the parties absolved from its performance, and all rights under it destroyed and ended. But in this case there was no divorce, but it was decreed, in the very teeth of our never doubted laws, to have been void. The tribunals of this State are not bound by the decree of the foreign tribunal. That government has no pretense of power to control the title to, or the descent of, property in this State. As to power of controlling the rights of, and descent of, property by that kingdom, it is absolutely wanting, and it can not, under any circumstances, control rights of persons in this State, under our laws. As well contend that had the laws of that kingdom been that none of its subjects should purchase or hold real estate without the consent of the king, and deceased had purchased this property as he did, and had died, his heirs could not inherit his property because he had not procured the consent of his king. I apprehend no one would contend for such a doctrine, and the effect of this case is to so hold. I am, therefore, unable to concur in the conclusion reached in this case.

*Filed at Ottawa May 12, 1882—Rehearing denied September Term, 1882.*