(70 Misc. Rep. 368.)

## MILLER v. MILLER.

(Supreme Court, Special Term, New York County. January, 1911.)

1. DIVORCE (§ 326*)—FOREIGN DIVORCE—VALIDITY.
    A divorce granted in Russia according to the laws thereof by a Jewish rabbi to Russian subjects there married and domiciled is valid here.
    [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 827–830; Dec. Dig. § 326.*]

2. DIVORCE (§ 326*)—MARRIAGE (§ 17*)—STATUS OF FOREIGNER.
    It is a settled rule of private international law that the status as to marriage and divorce of a foreigner in his own country will be recognized in any other country which he may select as his place of abode.
    [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 827–830; Dec. Dig. § 326;* Marriage, Cent. Dig. § 8; Dec. Dig. § 17.*]

Action by Eva Miller against Morris Miller. Motion for judgment on the pleadings. Complaint dismissed.

S. N. Tuckman, for plaintiff.
Henry Kuntz, for defendant.

ERLANGER, J. In March, 1902, the parties to this action were duly married in the town of Braelov, empire of Russia. On December 21, 1907, they, being at the time Russian subjects and domiciled in Braelov, appeared before a rabbi in the town of Shargorod, where

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the defendant then happened to be, and according to the Jewish and Russian laws were divorced. Each at the time received from the rabbi a. certificate of such divorce. The surviving issue of their marriage is. one child of the age of six years. After the divorce was granted, and on the same day, they entered into a written agreement, duly signed by each, whereby the defendant bound himself to pay to the plaintiff for the support of their said child the amount therein specified and for the time therein mentioned; and the plaintiff on her part agreed to keep with her said child and bring him up at her own expense until he reached the age of 14 years. When the child reached said age, the defendant agreed to care for him; but, if the plaintiff desired to keep him, defendant's duty to contribute to his support was to cease. This agreement also recites that the parties at the time of its execution were divorced. Shortly after these events, the defendant left Russia for this state. The plaintiff followed him, arriving in New York in February, 1909; and shortly thereafter she brought this action against him for a limited divorce, alleging as the grounds therefor his abandonment of her and nonsupport. The defendant in his answer, as a separate defense and counterclaim, sets up the Russian divorce, and avers that it is in full force and operation, and that the relation of husband and wife no longer exists. The plaintiff contends that the divorce so obtained is void, that rabbinical divorces are not recognized in this state, and that such a divorce is against the public policy and morality of the state of New York.

[1] The question to be determined is whether our courts will recognize a divorce so obtained. The authoritative character of a domestic judgment is founded, among other reasons, on the constitutional provision which guarantees full faith and credit to the records and judicial proceedings of every state; while the rule as to foreign judgments rests upon considerations of comity, and their conclusiveness depends upon whether jurisdiction of the subject-matter and persons was obtained, and, if so, they can only be attacked upon grounds hereafter stated.

The first inquiry must be directed to the Russian procedure in such cases. The evidence shows that under the laws of that empire as applied to all subjects of Jewish birth exclusive jurisdiction to perform matrimonial ceremonies and grant divorces is conferred upon all church rabbis, who, in turn, in the event of a marriage or divorce, report the fact to the crown rabbi, and the latter makes an entry thereof in a public record kept by him for that purpose. Unless such entry is made the divorce has no validity, but, when made, it becomes legalized under that government. This crown rabbi is elected by the Jewish communities, and such election is subject to the approval of the local government. Upon being so approved, he becomes the government's representative of such communities in civil matters. The crown rabbi is intrusted with the governmental docket and a seal which passes from crown rabbi to crown rabbi as they are elected. The Russian law confers jurisdiction upon the rabbis to grant divorces for whatever grounds the religion may sanction, and the cause assigned for a divorce will be deemed the ground under such law of the said empire. It was under this system that the parties to this action were

divorced; and subsequently, and on December 30, 1907, the defendant obtained from the crown rabbi and under his hand and seal a registry certificate, showing that the registry books of the town of Shargorod contain an entry of a divorce granted to the parties on December 21, 1907. This crown rabbi at the time of giving his certificate, according to the evidence, had held such position for many years, and proof of his election was not required. The evidence, however, affords sufficient basis for the presumption that he held such office by virtue of his election and the approval of the Russian government. 16 Cyc. 1076. The grounds of the divorce do not appear from such certificate, but were deemed sufficient by the rabbi who granted the same. It seems to the court quite clear that the plaintiff in this action was fully cognizant of the proceedings and entirely acquiesced therein. This is evident from the agreement entered into by the parties on the day the divorce was granted and which provides for the maintenance of their child, although no opinion is expressed as to the validity of that document under our law. We have it then established that both parties were at the time Russian subjects and domiciled in that empire, that they attended before the recognized tribunal of their country, and, after a hearing, their marriage was dissolved and each given a certificate to that effect. Their status by this divorce became fixed under the laws of their then domicile, and such dissolution had the effect of restoring each to a state of singleness.

[2] It is a settled rule of private international law that the status of a foreigner in his own country will be recognized in any other country which he may select as his place of abode. The precise question arose and was passed upon by the Privy Council in the case of Le Mesurier v. Le Mesurier (1895), A. C. 517–527, where Lord Watson said:

"When the jurisdiction of the court is exercised according to the rules of international law, as in the case where the parties have their domicile within its forum, its decree dissolving their marriage ought to be respected by the tribunals of every civilized country."

To the same effect, see Hilton v. Guyot, 195 U. S. 113, 16 Sup. Ct. 139, 40 L. Ed. 95 at page 110; Roth v. Roth, 104 Ill. 35, 44 Am. Rep. 81; Wheaton's International Law, § 151; 7 Lawson's Rights, Remedies & Practice, § 3726; 1 Nelson, Div. & Sep. § 33 et seq.; 4 Phillimore Internat. Law (3d Ed.) c. 21; Story, Confl. of Laws, c. 7, § 200 et seq.; Halleck, Internat. Law, c. 7, § 11. The effect of the power delegated to the rabbis to grant divorces was substantially to create an ecclesiastical court, recognized as such in the Russian Empire; and their pronouncement of sentence of divorce has the same effect in that country as like sentences have in the courts of our state. Even in England, down to 1858, all divorces were granted by ecclesiastical tribunals. Ackerman v. Ackerman, 200 N. Y. 72–76, 93 N. E. 192. The fact that the divorce may have been for a cause not recognized by our laws does not require the court to adjudge against its validity; indeed, the rule is quite to the contrary. In the case of Hunt v. Hunt, 72 N. Y. 217, 28 Am. Rep. 129, our Court of Appeals held that:

"Every state has the right to determine for itself upon what grounds the relation of marriage between persons domiciled within its territory may be

dissolved, and it may prescribe what legal proceedings may be had to that end."

In Jones v. Jones, 108 N. Y. 415, 15 N. E. 707, 2 Am. St. Rep. 447, the same court held that a foreign divorce is none the less a bar because it was for a ground which would not have been a cause for a divorce in this state. In Wall v. Williamson, 8 Ala. 48, a divorce of American Indians by mutual consent according to their tribal law was held to be valid. In that case the court said:

"Whatever may have been the capacity of the husband to abandon his wife, and thereby to dissolve the marriage, if both had become residents of Alabama after the tribe had departed from its limits it is very clear that the same effect must be given to a dissolution of the marriage by the Choctaw law as given to the marriage by the same law. By that law it appears the husband may at pleasure dissolve the relation. His abandonment is evidence that he has done so. We conceive the same effect must be given to this act as would be given to a lawful decree in a civilized community dissolving the marriage. However strange it may appear, at this day, that a marriage may thus easily be dissolved, the Choctaws are scarcely worse than the Romans, who permitted a husband to dismiss his wife for the most frivolous causes."

In Leshinsky v. Leshinsky, 5 Misc. Rep. 495, 25 N. Y. Supp. 841, a divorce granted by a Jewish rabbi in Russia under circumstances similar to those at bar was held valid. It is clear, therefore, under the authorities, that the divorce must be sustained, unless it is against the public policy or morality of our state, or unless it has been shown that the divorce was obtained either by fraud, mistake, or lack of jurisdiction. Plaintiff's contention that the divorce is against our public policy cannot be entertained. A rabbinical divorce granted here would have no validity. Penal Law, art. 136, § 1450 (Consol. Laws 1909, c. 40). Nor would a divorce under our law be granted for any cause other than adultery. As shown, the status of the parties was fixed by the Russian divorce. When they left their former domicile and took up their residence in this country, they came as single persons; and, while our courts will enforce its policy for the protection of its own citizens domiciled here and will not allow their status to be changed by foreign decrees or tribunals, the case at bar is not such a one as to be included within such established principle. Upon that point Sir Robert Phillimore, in his work on International Law, supra (volume 4, pp. 367, 368), lays down the rule in one of his subdivisions as follows:

"Ought a state, the laws of which do not permit divorce, to recognize a divorce decreed in another state to persons belonging in that state? To this question the answer seems on principle to be clearly in the affirmative; the foreigners, in this hypothesis, come into a foreign state with a particular status affixed to them by the foreign law of the state to which they belong. The only ground upon which this status could be refused recognition would be that it was contrary to the public policy or morality of the new state; but it seems clear that the residence in that state of two foreigners, as single persons, is not a case of this description; what the former status of these parties was is a matter of private history in no way affecting the state in which they happen to be now resident."

Again, in Nelson on Divorce and Separation, supra (volume 1, § 33), the author, writing on this subject, says:

"It would seem that the adoption of this rule would amount to the admission of its logical sequence that the status of a foreigner should determine his status here, and, if he was single, married, or divorced in another country, his status should remain the same here. (no question arising as to fraud or lack of domicile). The difficulty appears to be that a divorce, although it creates a new status, is dependent in some cases upon a decree, and our courts are tempted to refuse to consider a decree as operative if, for technical reasons, the decree was rendered in violation of our rules of jurisdiction. Thus if the divorce in question is by permission of a church, or is a divorce at will, according to the customs of a race or tribe of a semicivilized people, the divorce is accepted as valid, if valid in the country where the divorce became operative. The case is not materially different where the status of the foreigner is created by a decree, except that his status is a matter of record. If comity is extended to one, it should be to the other, for the difference is not one of status, but of record proof of status. The conclusion is certain that if, through comity and for the security of property rights, we recognize foreign marriages, we must also recognize the status of divorced foreigners, and determine the validity of such divorces by the law of the place where they were granted. The status of a divorced foreigner is not determined by the validity of the divorce in the country where it was determined, but the American rule appears to be that a foreign divorce is valid if regularly obtained according to the jurisprudence of the country where the marriage was celebrated and the parties are domiciled. The regularity of the proceedings is determined by the law of the country; but the jurisdiction of the court and consequently the domicile of the parties is always an open question, and is determined by our law relating to jurisdiction rather than by the local law. In general it may be safely said that any foreign divorce will be recognized in America if valid in the country where rendered, unless it appears that the court rendering the divorce had no jurisdiction. If the plaintiff or defendant did not have a domicile in the country, the decree will be held void and inoperative. * * * The jurisdiction of the foreign court which granted the divorce is held to be open to inquiry by American courts, and the decree will be held inoperative if the jurisdiction of the foreign court was not in accordance with our views of jurisdiction. This may be a correct principle of international law so far as it applies to property rights, but it does not necessarily apply to the status of a foreigner. Unless the plaintiff was in fact a domiciled resident of our country at the time, the foreign decree should be recognized, for it has rightfully given the plaintiff a status in his own country. The foreign decree should be subjected to but one test—whether the plaintiff had such a domicile in the country that he could not have been a temporary resident with the intent to have his domicile elsewhere."

Nothing having been shown to impeach the finding of the rabbinical court, either for fraud, mistake, or lack of jurisdiction, plaintiff's motion for judgment must be denied, and the complaint dismissed.

Complaint dismissed.