0:36 LRA 643

ELIZABETH R. DUNHAM

*v.*

RANSOM W. DUNHAM.

*Filed at Ottawa May 12, 1896—Rehearing denied October 13, 1896.*

162  589
165  600

162  589
e183  388

162  589
186  638

162  589
199  ⁴450

1. DIVORCE—*wife leaving husband for cause may obtain valid divorce in foreign State through publication.* A decree of divorce obtained by a wife who separates from her husband for adequate cause and in good faith removes to another State with the intention of permanently residing there and becomes a *bona fide* resident there, is valid as against the husband who remains in the State of his residence and is served only by publication, without any appearance by him in the State in which the decree is rendered.

2. SAME—*ex parte proceeding must be fair and free from deception.* It is the duty of the applicant in an *ex parte* proceeding for divorce, upon pain of obtaining an invalid decree, to avoid practicing any deception on the court in any matter affecting its jurisdiction, or its discretion to proceed, or not, to the final determination of the cause.

3. SAME—*duty of complainant in, to disclose existence of pending suit by other party.* A wife who, upon separation from her husband, goes to another State for the purpose of obtaining a divorce, and brings a suit without disclosing the fact that a suit is pending in the State of her former residence, involving the same matters alleged as a cause of divorce, and in which she has appeared, is guilty of such fraud as to invalidate a decree of divorce obtained by her, although the pendency of the prior suit could not have been pleaded in abatement or in bar to her divorce suit.

4. SAME—*where foreign jurisdiction is sought solely to obtain divorce, it is invalid.* A decree of divorce granted by a court of another State to a woman who went to such State from Illinois for the sole purpose of obtaining a divorce, with the purpose of returning to Illinois when she should be divorced, is invalid in Illinois as against a husband served only by publication and who did not appear.

5. APPEALS AND ERRORS—*when error in sustaining demurrer to cross-bill is harmless.* An erroneous ruling in sustaining a demurrer to a cross-bill is harmless, where all the facts and circumstances alleged in such cross-bill were brought before the court, so as to show that such cross-bill could not have been maintained upon the facts.

6. EVIDENCE—*how adultery may be proved.* Adultery may be proved by the inferences arising from the acts of parties, although not directly shown.

*Dunham* v. *Dunham,* 57 Ill. App. 475, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from Circuit Court of Cook county; the Hon. SAMUEL P. McCONNELL, Judge, presiding.

This is an appeal from a judgment of the Appellate Court affirming a decree of the circuit court of Cook county, granting to appellee, Ransom W. Dunham, a divorce from appellant, Elizabeth R. Dunham. The parties were married in the city of Philadelphia on December 24, 1889, and a few days thereafter took up their residence in the city of Chicago, where they lived together until December 31, 1892, when appellant left Chicago and the State of Illinois in company with Arthur W. Allyn, with whom it is alleged in the bill she committed adultery at divers times and places, and went to Canton, in the county of Lincoln, in the State of South Dakota, where she claimed to reside until after she there obtained a decree of divorce from appellee, as hereinafter mentioned.

On March 25, 1893, appellee filed in the circuit court of Cook county, Illinois, a bill in equity, stating therein his residence in that county for more than two years before that time; his citizenship in this State; his intermarriage with appellant on December 24, 1889; their residence together as man and wife in Chicago until December 31, 1892; charging adultery between appellant and Arthur W. Allyn in Chicago on February 23, 1893, and at other former times; alleging appellee's ownership, at the time of the marriage, of certain real estate situate in Cook county; the voluntary conveyance of these premises by appellee to appellant for a homestead on June 15, 1891; the constant use of the conveyed premises by appellant and appellee as a joint homestead after the marriage and until December 31, 1892, and such use by appellee since that time; uncaused and voluntary abandonment of appellee and her home by appellant on that date, and subsequent pretended residence by her in South

Dakota; charging, also, appellant with the clandestine disposition of horses and a carriage belonging to appellee, and wrongful claim to a portion of the household furniture belonging to appellee; that appellant secretly and without authority leased the homestead and all furniture therein, with the intention to remove appellee from the possession of said premises and deprive him of his homestead rights therein; charged the assignment to appellant of certain insurance policies on appellee's life, and payment of dues thereon by appellee; the leaving with appellee by appellant of her child by a former husband; a conspiracy between appellant and her paramour, resulting in appellant's secret journey with him to Canton and Sioux Falls, South Dakota, for the purpose of obtaining a fictitious residence there, and there to secure, or attempt to secure, a divorce from appellee; alleged that on December 31, 1892, in pursuance of a concerted plan between appellant and said Allyn, she voluntarily abandoned appellee, left said homestead and went to Canton and Sioux Falls, in the State of South Dakota, for the purpose of obtaining a residence there, in order to institute proceedings for, and, if possible, obtain, a divorce from appellee under the laws of said State of South Dakota; "that the said Elizabeth R. Dunham has retained counsel and has caused a formal complaint for divorce to be drawn, containing false and fictitious charges and allegations of cruelty on the part of your orator, and that said Elizabeth R. Dunham still continues her pretended, alleged and assumed residence in the State of South Dakota, although she has, at various times since the said 31st day of December, 1892, visited the city of Chicago, county of Cook and State of Illinois, for short intervals;" that appellant, on December 31, 1892, went to Canton, South Dakota, with said Allyn; that while in South Dakota she frequently committed adultery with said Allyn between the 1st and 8th days of January, 1893; that the homestead was conveyed and

the policies of insurance transferred to appellant under the belief, on the part of appellee, that appellant was and would continue a faithful wife, but that appellant had refused to live with appellee as his wife, had abandoned him and committed adultery. The prayer is: First, for a divorce from the bonds of matrimony; second, for an injunction against appellant to prevent the disposition by her of the homestead or furniture; third, for the cancellation of the deed of conveyance of the real estate to appellant; fourth, for the re-transfer to appellee of the life insurance policies; fifth, the custody of the child of appellant; sixth, for restraining appellant from mortgaging, encumbering, selling, conveying or leasing sub-lot 3, in the city of Chicago, and the furniture of appellee situated thereon, and in any way interfering with appellee's possession of the homestead premises, and for general relief.

On April 25, 1893, the summons in said cause was personally served upon appellant at the city of Chicago. Thereafter, on May 3, 1893, appellant appeared and filed her answer in said cause. The answer denies the allegations of adultery, alleges she has been a faithful wife, and states that appellee's conduct towards and treatment of appellant were such as to render it destructive of her happiness and dangerous to her health to continue to live with him as his wife; that in September, 1892, impelled by these causes, appellant ceased to live with appellee as his wife, and on December 31, 1892, she removed to and took up her residence in the State of South Dakota. The answer further states that they came to Chicago on December 31, 1889, and temporarily resided at the Grand Pacific Hotel until May 18, 1890; that she immediately discovered that he was a man of low and vicious habits, and during the first week of their married life he conducted himself in a most violent and loathsome manner; that after leaving said hotel they took up their residence in the said homestead, and defendant con-

tinued to occupy the same from that time until December 31, 1892; that during said time on two occasions she left Chicago and went east with the avowed intention never to return, owing to the coarse, brutal and inhuman treatment bestowed upon her by complainant, but that for the sake of her own social position and that of her child she returned each time to complainant; that complainant at all times insisted upon subjecting this defendant to devices and artifices to prevent conception; that defendant refused to submit to them, and in the month of February, 1890, became and was *enceinte*, but that complainant, in pursuance of his avowed intention never to have children, procured a miscarriage upon her in the latter part of April, 1890, by the use of certain nauseous, noxious and dangerous drugs, and administered the same to her and required her to take the same against her will, which this defendant then and there unwillingly did; that complainant insisted upon this course of treatment from time to time, and forced defendant to submit to dangerous practices, and that by reason of the same defendant became sick, her health greatly impaired, and in consequence thereof she has suffered, and still continues to suffer, great bodily pain; that for more than three months before defendant left said homestead, owing to the conduct and treatment of complainant, she refused entirely to cohabit with complainant, although she lived in said homestead ostensibly as his wife.

The answer further states: "Defendant denies that she voluntarily, on or about December 31, 1892, and without cause, left and abandoned the said homestead premises and the complainant, and that she has since voluntarily absented herself from said premises and the complainant, but on the contrary thereof, defendant says that she left her said home in which she and the complainant were residing, as aforesaid, on the 31st day of December, 1892, because she could no longer continue to live with the complainant as her husband on account of

162—38

the inhuman and unnatural conduct and brutal treatment of the complainant towards defendant; * * * that driven and forced thereto by the cruelty and brutality of the complainant herein referred to, she was compelled to and did take up, on the 31st day of December, 1892, her residence elsewhere, as the complainant persisted in continuing to remain in and reside upon said homestead premises; that it is true that the defendant proceeded, on the 31st day of December, 1892, to the State of South Dakota, and that she has since said date resided in said State, and that her home and residence since said time has been and now is in said State of South Dakota; that it is not true that the defendant fraudulently or clandestinely, or without the knowledge of the complainant, went to said State of South Dakota, but on the contrary, as will hereinafter more fully appear, the complainant at the time had full knowledge and notice of the intention of the defendant to so change her residence and take up her abode in the said State of South Dakota; that in 1886, and for a considerable time prior thereto, the defendant was a permanent resident in the State (then territory) of Dakota, where she was living with her husband, George W. Wallace, who shortly thereafter departed this life, and who was the father of Nellie Wallace, the infant referred to in said bill; that on account of the cruel and unnatural conduct of the complainant towards the defendant, and after having endured the same until further endurance was impossible, the defendant, in September, 1892, ceased to live with the complainant as his wife, though she continued to live in and reside upon said homestead premises thereafter until the 31st day of December, 1892. * * * Defendant denies that on December 31, 1892, or at any other time, in pursuance of a concerted plan or conspiracy between the defendant and Arthur W. Allyn, she voluntarily and without just cause or reason whatsoever abandoned complainant and left said homestead, but defendant says that it

is true that on said date, being compelled thereto by the inhuman, merciless and cruel practices and conduct of the complainant, * * * she did leave said homestead and did proceed to the State of South Dakota and did then and there take up her residence, and that she then became and now is a resident of said State of South Dakota; that it is true that on said 31st day of December, 1892, she went to said State of South Dakota, but denies that she went there without the knowledge of complainant, and states that he had full knowledge that she was going there, and denies that while in South Dakota, or at any other time or place, she committed adultery with said Allyn." The answer then sets up defendant's rights to the home place conveyed to her, and to the insurance policies sought to be recovered by the complainant, and denies that she left with complainant her daughter, a child of eight years, the fruit of her former marriage, but alleges that the child was left in the homestead with her nurse, a competent person, who had been the child's nurse for five years, and because she did not wish to take the child out of school, and because she had been unable to secure, properly furnish and maintain a house in South Dakota to which she could remove her daughter; that she made frequent visits to Chicago to see and look after her child and to defend this suit, and others affecting her property interests.

The answer further alleges: "That defendant continued to live with complainant until she could endure such existence no longer; that on two different occasions within two years last past he cruelly struck and beat her, the first time being in Chicago in June, 1891, and was occasioned by his becoming enraged at her for refusing to tell an untruth about his property upon the examination in the county court in the insolvency proceedings of R. W. Dunham & Co.; that at that time he assaulted her with a cane which he held in his hand, striking her a hard blow upon the wrist; that the second occasion was

between the 15th and 20th of October, 1892, in Chicago; that at that time he became enraged at defendant without provocation and struck violently at defendant with closed fists, and would have struck and injured her seriously had she not with a quick movement retired, so as to evade the blow; that complainant has been unfaithful to his marriage vows; that he has at different dates and times during their marriage, and particularly between November 14, 1892, and the latter part of December, 1892, committed adultery with some woman or women unknown to defendant, and at times between January, 1893, and March 25, 1893, in Chicago, likewise committed adultery with some woman or women unknown to the defendant; that after the defendant had taken up her permanent residence and domicil in said State of South Dakota, as hereinbefore set forth, the complainant was made acquainted by the defendant with her intention some time in the future to seek in said State where she was then residing and domiciled, a legal separation from the complainant, as she had a legal and complete right to do; that it is not true that defendant has, or ever had, any intention or threatened to allege in such proceedings any charge or fact which was colorable or untrue in any particular; that upon one of her visits to said city of Chicago since defendant acquired a residence and domicil in said State of South Dakota, the complainant demanded and requested that the defendant release and forego to the complainant all of the defendant's right, title and interest in and to said homestead premises and in and to said policies of insurance; that the defendant refused to comply with such unjust and improper demand, and thereupon the complainant, for the purpose of harassing and annoying defendant, and forcing and coercing her to yield to complainant's demand, filed the bill of complaint herein."

Afterwards, on May 3, 1893, the complainant filed his replication to the answer, and afterwards, on June 30,

1893, on motion of defendant, (the appellant,) the prelim-
inary injunction was dissolved and her motion for ali-
mony *pendente lite,* and that complainant pay her solicitor's
fees, was heard and denied.    At the September term,
1893, of said circuit court of Cook county, the complain-
ant (the appellee) moved the court for an order enjoining
the defendant from prosecuting a suit which she had
commenced in the circuit court of Lincoln county, South
Dakota, on July 8, 1893, against appellee for divorce.
The motion was supported by affidavits setting up the
proceedings in the Dakota court, but was overruled.

On May 24, 1894, appellant filed her cross-bill in this
cause, alleging the filing of the bill of complaint against
her for divorce by appellee, the service of process upon
her, her appearance and answer to said bill, the filing of
his replication by appellee, and that the cause had been
set for hearing but was as yet pending and undetermined.
The cross-bill then proceeds to set up the marriage and
the causes of separation; alleges that appellee had been
guilty of extreme cruelty to appellant, and sets up spe-
cific acts of cruelty, in substance the same as stated in
her answer; alleges, also, that appellee had been guilty
of adultery, the allegations in this regard being also sub-
stantially as alleged in the answer; alleges that, being
compelled to leave her home in Chicago and having no
other place to go, she on December 31, 1892, went to the
State of South Dakota, with the intention and for the
purpose of taking up her residence in said State and per-
manently residing therein, and that ever since said date
she has resided and does now reside in the county of
Lincoln in said State.    The cross-bill further alleges,
that on the 8th day of July, 1893, appellant was, and for
more than six months prior thereto had been, a citizen
and resident of the State of South Dakota; that on that
date, in the circuit court of Lincoln county, in said State,
appellant commenced an action for divorce against ap-
pellee; that the circuit court of Lincoln county was then,

and has ever since continued to be, a court of record, with general law and chancery jurisdiction and with full power to hear and determine a claim for divorce; that on said 8th day of July, 1893, appellant filed her complaint in said case, setting up complete and sufficient grounds for divorce under the laws of said State, and thereupon a summons was duly issued in said cause, addressed to appellee, and requiring him to answer said complaint within thirty days after the service thereof upon him; that on said day said summons was delivered to the sheriff of said county, who thereafter returned the same into said court, and thereon certified that said appellee could not, after due diligence and inquiry, be found in said county, but that he had learned, upon inquiry, that appellee resided in the city of Chicago, in the State of Illinois; that said complaint was filed and said summons was issued and returned in accordance with the statutes then in force in said State of South Dakota; that upon the return of said summons appellant filed an affidavit stating that such action was brought for a divorce, that the complaint therein was duly filed in the office of the clerk of said court on the 8th day of July, 1893, and that the allegations therein contained were true; that upon the filing of said complaint a summons was duly issued, directed to appellee, and placed in the hands of the sheriff of said Lincoln county, to be served as the law directs; that thereafter said sheriff returned said summons, and thereon certified that, after diligent search and inquiry, he had been unable to find appellee in said county, but had ascertained that he resided in the city of Chicago, in the State of Illinois; that by said affidavit it was further shown that said appellee resided at No. 3870 Lake avenue, in the city of Chicago and State of Illinois; that upon the filing of the above affidavit an order of publication was entered by said court in said cause, ordering and directing that the summons in said action, in accordance with the statutes, be published for

six consecutive weeks in the *Sioux Valley News,* a weekly newspaper published at Canton, in the said county of Lincoln and State of South Dakota, and that a copy of the complaint in said cause, together with a copy of the summons and order of publication, be deposited in the post-office, with the requisite postage prepaid, and addressed to appellee at No. 3870 Lake avenue, Chicago, Illinois; that thereafter, on the 10th day of July, 1893, pursuant to the statutes of South Dakota in such cases made and provided, the said complaint, together with a copy of the summons and order of publication, was served upon appellee by delivering the same to him at Chicago, in the State of Illinois; that on September 19, 1893, after said complaint, summons and order of publication had been served upon appellee, he moved the court to grant an order in this cause restraining appellant from prosecuting her said suit in the circuit court of Lincoln county, South Dakota, and in support of said motion appellee filed an affidavit, of which he made said complaint, summons and order of publication a part, and in which he expressly admitted that said papers were served upon him at Chicago; that on September 19, 1893, the motion of appellee for an order restraining appellant from prosecuting her said suit for divorce in the circuit court of Lincoln county, South Dakota, came on to be heard, and was denied; that thereafter, on September 21, 1893, said suit brought by appellant in the circuit court of Lincoln county, South Dakota, came on for hearing, and said court, having heard the evidence, entered a decree granting to appellant a divorce from appellee, absolving each of the parties from the bonds of matrimony then and theretofore existing between them, and authorizing appellant to resume her former name, Elizabeth R. Wallace; that at the time the said suit in South Dakota was commenced, and at the time the decree therein was rendered, the statutes of South Dakota provided that marriage is dissolved, first, by the death of

one of the parties, and second, by the judgment of a court of competent jurisdiction decreeing a divorce of the parties; that the effect of a judgment decreeing a divorce is to restore the parties to the state of unmarried persons; that among other causes in said statutes mentioned, it is provided that a divorce may be decreed for extreme cruelty, and that by said statutes extreme cruelty is defined as "the infliction of grievous bodily injury or grievous mental suffering upon the other by one party to the marriage;" that by the statute of said State of South Dakota it was also provided, that where the person on whom service of summons is to be made can not, after due diligence, be found within the territory, and that fact appears by affidavit to the satisfaction of the court or judge thereof, and it also appears that a cause of action exists against the defendant upon whom service is to be made, the court or judge may grant an order of publication in certain cases enumerated in said statute, among which are actions for divorce; that in the statute regulating service of publication in divorce cases, it is provided that when publication is ordered, personal service of a copy of the summons and complaint out of the territory is equivalent to publication and deposit in the post-office; that said statute also provided that a divorce cannot be granted unless the plaintiff has been a *bona fide* resident of the State of Dakota for at least six months prior to the commencement of the action therefor; that the said decree rendered by the circuit court of Lincoln county, in the State of South Dakota, remains in full force and effect, unreversed and not appealed from, and prays that said decree be given, in this action, the same force and effect which it has in the State where it was rendered, and that it be held to be a complete bar to the further maintenance of this suit.

Full exhibits of the complaint, notice of proceedings, findings of the court and final decree as alleged, were attached to the cross-bill.

The findings of the Dakota court were:   First, that the parties were married at the city of Philadelphia, in the State of Pennsylvania, on December 24, 1889; second, that of said marriage there was and is no living issue; third, that after said marriage the parties resided at the city of Chicago, in the State of Illinois, until December 31, 1892; fourth, that appellant now is, and for more than six months next immediately preceding the commencement of this action has been, in good faith, a resident of the State of South Dakota; fifth, that since the marriage appellee has been guilty of extreme cruelty toward appellant in this, that appellee, at all times since their marriage, and during their cohabitation as husband and wife, has been unwilling that appellant should bear children, and to prevent the begetting according to the natural result of their matrimonial intercourse as husband and wife, has required appellant, contrary to her will, to use dangerous means and injurious artifices and practices in and upon her person to prevent her natural conception, and when conception had taken place, to procure a miscarriage; sixth, that after the parties were married, and while they lived in Chicago, appellee, with intent to cause appellant to have a miscarriage, administered to her certain noxious and dangerous drugs, which caused appellant to become, and for a long time to remain, violently and dangerously ill, during which illness she miscarried; seventh, that during all the time appellant continued to reside and cohabit with appellee, he required her to allow to be used in and upon her person various dangerous means to prevent conception, and, among others, to inject into her person large quantities of cold water immediately after intercourse, by reason of which her health was impaired and her life endangered; eighth, that each and all of said preventive acts were done and required to be done by appellee and against the will and remonstrance of appellant, and that to continue to live and cohabit with appellee would seriously

impair appellant's health and endanger her life; ninth, that the allegations of the complaint herein are true; tenth, that appellant, Elizabeth R. Dunham, is entitled to a decree of the court dissolving the bonds of matrimony heretofore and now existing between her and appellee, Ransom W. Dunham, and permitting her to resume her former name, Elizabeth R. Wallace.

Upon the foregoing findings the court entered a final decree, the conclusion of which is as follows: "Now, upon advisement and upon motion of Arthur R. Brown, attorney for the said plaintiff, and pursuant to the said findings and decision and as therein directed, it is hereby adjudged and decreed that the bonds of matrimony heretofore and now existing between the plaintiff, Elizabeth R. Dunham, and the said defendant, Ransom W. Dunham, be and they are hereby dissolved, and the said parties, and each of them, are hereby divorced from each other, and absolved and freed from all obligations in respect to their said marriage, and the said Elizabeth R. Dunham is hereby authorized to resume the name of Elizabeth R. Wallace, her former name."

In addition to the grounds for divorce set forth in said findings, there were set up in the complaint filed in the Dakota court, specific assaults and acts of violence by appellee, substantially the same as charged in the answer and cross-bill in this cause.

Upon the above cross-bill being filed, appellee filed thereto a demurrer, which was both general and special. The special grounds of the demurrer were: First, that the matters set forth in the cross-bill were not germane to the subject matter of the original bill; second, that the matters set forth in the cross-bill are simply matters of defense; third, that the cross-bill does not pray for affirmative relief against appellee. This demurrer was, upon argument, sustained by the court, and thereafter, the case coming on for final hearing, the court entered a decree finding appellant guilty of adultery and granting

a divorce to appellee. The decree, among other things, found that on December 31, 1892, and for more than a year prior thereto, appellant and appellee resided upon the homestead premises in Chicago, the title to which, in fee, was in the appellant, and that on that date she voluntarily left appellee, and that, in violation of her marriage duties, she did, between January 1 and 8, 1893, commit adultery with Arthur W. Allyn, in Canton, county of Lincoln, State of South Dakota. The custody of the daughter of appellant was given to her; the fee of the home place adjudged to be in appellant with an estate of homestead in appellee; that she be barred of dower, and that the bill be dismissed as to appellee's claim to the insurance policies. From this decree appellant brings this appeal.

MORAN, KRAUS & MAYER, for appellant.

GEORGE W. PLUMMER, WHARTON PLUMMER, and REED, BROWN & ALLEN, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

The principal question of law presented by this record is, what was the effect of the decree of divorce obtained by appellant, against appellee, in the circuit court of Lincoln county, State of South Dakota, and set up in her cross-bill in this cause in the circuit court of Cook county as a bar to the further maintenance of this suit? · As the Dakota decree was obtained after issue made in this cause, it is conceded, and there can be no doubt, that to avail herself of such decree as a defense to this suit the rules of equity pleading required that she should set it up by cross-bill. Story's Eq. Pl. (9th ed.) sec. 393; *Ferris* v. *McClure*, 36 Ill. 77; *Jenkins* v. *International Bank*, 111 id. 462.

If we assume, under the allegations of the cross-bill admitted by the demurrer, that the appellant had, in good faith, resided in the State of South Dakota a suffi-

cient length of time under its laws to give its courts jurisdiction over her and her status as a married woman, and that the proceedings there were without fraud on her part, then, if the appellee had been personally served with process in that State or had voluntarily appeared as a party in the case, there could be no doubt, from the standpoint of any of the authorities, that the South Dakota decree would be a complete bar to a suit for divorce brought by appellee in this State, and that it would make no difference that the suit here was first begun. (*Jones* v. *Jones,* 108 N. Y. 415; 2 Bishop on Marriage, Div. and Sep. secs. 1590, 1595.) But where the decree first rendered is obtained in a suit against a non-resident spouse who is not personally served with process within the jurisdiction of the court or who has not appeared in the cause, there is much conflict in the authorities as to the effect of the decree on the status of the non-resident spouse, and consequently on a suit for divorce brought by such spouse in his or her own jurisdiction.

Without reference to the evidence, and confining ourselves to the pleadings in considering the demurrer to the cross-bill, it is seen that this suit was brought by appellee in the circuit court of Cook county and personal service of process had upon appellant in that county, and that she appeared and filed her answer to the bill before she commenced her suit in South Dakota, and that appellee was never served with process in South Dakota and never appeared in the suit begun there, so that, so far as appellee was concerned, the South Dakota decree was based upon substituted service merely,—that is, upon publication of notice as required in that State, and personal service in Illinois with a copy of such notice and of the complaint. The doctrine seems to be held in New York and in some other jurisdictions, that in such a case, while the decree is valid as to the party in whose favor it is granted, it is void as to the non-resident de-

fendant. The theory of the cases so holding appears principally to be, that proceedings for divorce are *in personam* and not *in rem*, and as no valid judgment *in personam* can be rendered in other cases by a court having no jurisdiction over the person of the party against whom it is rendered, neither can such a judgment be rendered in suits for divorce. But it would seem clear that if such theory were carried to its legitimate conclusion the decree would be void as to both parties, for to give it any validity, even as to the party securing it, the proceedings must be regarded to some extent as *in rem*, and that the *res* is the marriage status. It is not doubted in any of these cases, or by any one, that each State has the exclusive right to determine by its own adjudication the status of its own citizens domiciled within its own jurisdiction. It would seem to follow, therefore, that if the appellant, on a separation from appellee, her husband, for adequate cause, in good faith removed to South Dakota with the intention of permanently residing there, and did become a *bona fide* resident there, the courts of that State had jurisdiction to adjudicate upon her status as a married woman, and, for any cause sufficient under the laws of that State for the purpose, could change her status to that of a single woman. This cannot be admitted without conceding also that a suit for divorce, so far as it seeks to dissolve the marriage relation merely, is a proceeding *in rem*, and that the thing proceeded against is the status of marriage.

It is, however, insisted, and is sometimes said, that there is a status of the wife as a married woman and a status of the husband as a married man, and that each may proceed in different jurisdictions to change, and may thereby change, his or her own status without affecting that of the other,—and this is the practical effect of the doctrine as laid down by the courts of New York, although, as before stated, it seems that proceedings for divorce are there regarded as being *in personam*, rather

than as *in rem.* In *People* v. *Baker,* 76 N. Y. 78, the Court
of Appeals, by a divided court, affirmed a conviction of
bigamy against a man, a citizen of that State, who mar-
ried again in New York after his wife, domiciled in Ohio,
had procured a divorce from him valid under the laws of
Ohio, though based upon substituted service only. By
the laws of Ohio the wife was lawfully divorced. By sec-
tion 1, article 4, of the constitution of the United States,
and the legislation of Congress thereunder, the decree
was entitled to the same full faith and credit in New
York as, by law and usage, it was entitled to in Ohio.
The consequence was, that the wife was, and on remov-
ing to New York would continue to be, a single woman
who might lawfully marry, while the husband was a mar-
ried man, having for his wife one who might at the same
time become or be the lawful wife of another man. We
cannot regard as sound a doctrine leading to such results.
We are unable to see the force of the reasoning which is
used to support judicial conclusions that one of the mar-
ried pair may in one jurisdiction, by virtue of its laws
and in honest compliance with them, obtain a valid de-
cree of divorce which, as to the one obtaining it, is valid
and binding in every State in the Union, leaving such a
one single and free to re-marry in any State, while the
matrimonial bonds are still unsevered as to the other
party, making him a bigamist should he re-marry, and
his children, the fruit of such re-marriage, illegitimate.
It would seem to be as logical to say that one of the
Siamese twins might have been severed from the other
without that other being severed from the one.

It should not be forgotten that it is the policy of a
great majority of the States, and of our own State as
well, as established by legislative enactments, to grant
judicial decrees of divorce to *bona fide* residents who com-
ply with the statutory requirements, where substituted
service merely is had upon the non-resident party. To
hold such decrees valid only within the jurisdiction

granting them, or valid only as to those in whose favor they are granted, leaving the non-resident parties still bound, would not only be inconsistent with the policy of our own laws and in violation of inter-State comity, but would, when it is considered how great is the number of such decrees entered every year, eventually lead to the most perplexing and distressing complications in the domestic relations of many citizens in the different States.

No such results can flow from the rule governing the relation of guardian and ward, master and servant or principal and agent, and no such analogy exists between those relations and that of husband and wife, as that the same principle should be applied in their formation, effect and dissolution, as supposed by counsel. Marriage, as understood among civilized people, is the union of one man with one woman, and if valid where celebrated is valid everywhere; and it would seem to follow from the "full faith and credit" clause of the constitution of the United States, and it ought to follow as a matter of logic and from the comity of States, that where that union is lawfully dissolved in one jurisdiction where one of the parties is in good faith domiciled, and in honest compliance with its laws, it should be treated as dissolved everywhere, (1 Nelson on Divorce and Sep. 65,) though it must not be forgotten that the law favors marriage but does not favor divorce. It is no sufficient answer to say that a husband or wife in fault may wrongfully leave the other, and, after acquiring a domicil in another jurisdiction, sue for and obtain a divorce without the knowledge of the innocent party. The most sacred relations of life are, from their very nature, capable of the greatest abuses; and it would generally be true that the innocent party could proceed in his or her own jurisdiction, and the foreign decree, even if first obtained, would, like any other, be open to attack for fraud or lack of jurisdiction,—defenses which in most cases would be found sufficient, for in all cases of such *ex parte* proceedings the

courts should hold the party so applying to the utmost candor and good faith, not only to the opposite party but to the court as well. Besides, it would seem to. be a necessary incident to the marriage relation, that whenever the parties to it have become separated and reside in different jurisdictions, the status of marriage of each to the other follows each, and inheres in the jurisdiction in which he or she is domiciled, and while a bill will not lie for a divorce in favor of a non-resident or to change his status from a married to a single man, yet when the status of marriage is destroyed in one jurisdiction as to the one there residing it is necessarily destroyed in the other, for, as well said by Mr. Bishop, "matrimony can only exist in pairs." This author, in maintaining that the marriage status may be changed by the jurisdiction where only one of the parties resides, among other things says: "The law knows only two forms of status as to matrimony,—married, single. A man who has a wife, or a woman who has a husband, is married. One without a husband or wife is not married—is single. And it is immaterial to this proposition whether or not either or both were once married, or whether the dissolution of a former marriage was by death or divorce. Taking one party out of. the marriage, by whatever means, leaves the other single. A husband without a wife or a wife without a husband is unknown to the law." 2 Bishop on Marriage, Div. and Sep. sec. 1613; 1 id. secs. 698-702. See, also, to the same effect, the late work of 1 Nelson on Divorce and Sep. 53, *et seq.*

In Brown on Jurisdiction (sec. 76) the author says: "In the relation in which it (the status or condition) arises it is purely transitory, yet follows as a condition attached to the person, as, when a man and woman are married each carries that status, so that a court having jurisdiction over one may dissolve it as to both. It arises more commonly in suits for divorce, and it may now be said that where one of the parties becomes a res-

ident of the State or is domiciled therein, he or she may apply to the court of the State having jurisdiction over that party as a citizen thereof, and the court may dissolve that relation or status, although the other spouse has never been within the jurisdiction of the State and owes no allegiance to it. It, therefore, is necessarily held to be a thing, within the meaning of the law, that is attached to citizenship or a domiciled person in the State, and the jurisdiction grows out of that thing."

In Black on Judgments (sec. 822) it is said: "In America it is generally held, and, indeed, almost universally, that as a proceeding in divorce is intended to affect the status of the parties, and is therefore essentially *in rem*, the judgment pronounced, whether in a foreign country or in a sister State, by a court having lawful jurisdiction of the cause, and in the absence of fraud, is valid and binding everywhere and in all subsequent controversies, provided the applicant was *bona fide* domiciled within the territorial jurisdiction of the court, although the other party, being a non-resident, was notified only by advertisement or some other species of constructive service." And after commenting upon a line of decisions holding the contrary view the same author (sec. 932) says: "But some of these cases have been overruled, others have been tacitly repudiated, and the true, fundamental principles governing the question have become more and more clear to the courts and have gained weight with the increasing body of decisions, so that now the rule may be regarded as settled by the great preponderance of authority, that a decree of divorce pronounced by a competent court, in favor of a *bona fide* domiciled citizen of the State and against a non-resident, where service of process was made by a reasonable constructive notice, and in the absence of any fraud or collusion, is valid and binding both in that State and in all other States."

Reference may be had also to the following authorities, among many others, which directly or inferentially

162—39

support the conclusions we have reached: *Pennoyer* v. *Neff*, 95 U. S. 714; *Ditson* v. *Ditson*, 4 R. I. 87; *In re James' Estate*, 33 Pac. Rep. (Cal.) 1122; *Gould* v. *Crow*, 57 Mo. 200; *Thompson* v. *State*, 28 Ala. 1; *Thurston* v. *Thurston*, 59 N. W. Rep. (Minn.) 1017; *Cox* v. *Cox*, 19 Ohio St. 502; *Thompson* v. *Thompson*, 8 South. Rep. (Ala.) 419; *Smith* v. *Smith*, 10 id. (La.) 248; *Roth* v. *Roth*, 104 Ill. 35; *Knowlton* v. *Knowlton*, 155 id. 158; *Van Orsdal* v. *Van Orsdal*, 67 Iowa, 35; 1 Bishop on Marriage, Div. and Sep. secs. 698, 699.

It by no means follows from this view that other States may impose on us their own domestic policy contrary to that which we may have established for ourselves,—any further, at least, than our complex system of government, and that anomalous thing, the status of marriage, existing between a separated pair, (husband and wife,) each residing in a different jurisdiction, render unavoidable. It is seen, also, that there is a practical uniformity in the policy of a majority of the States on the question. The rule, all but universal, that a marriage valid where celebrated is valid everywhere, is not applied to render polygamous marriages valid in monogamous States. (1 Bishop on Marriage, Div. and Sep. secs. 305-309, 868.) It would, however, seem to follow that a high duty as to publicity, candor and fairness would be imposed on the husband or wife seeking divorcement from his or her non-resident spouse upon mere constructive service, commensurate with the importance of the questions involved, not only to the absent defendant but to the court and public as well, for it is familiar doctrine that the husband and wife are not alone interested in the suit for divorce brought by one against the other, but the public interests are also regarded as involved, and to such extent that in some jurisdictions the State is represented by counsel, but generally the court itself is alone relied on to protect the public interests in such cases. (1 Nelson on Divorce and Sep. secs. 7, 8.) And the court will in no case enter a decree of divorce upon the

mere consent of the parties, but will in all cases require sufficient evidence to establish the complainant's right to the decree under the statute. In *Way* v. *Way*, 64 Ill. 406, this court, after construing our statute relating to divorce and passing upon the evidence in the case, said (p. 414): "Though a suit for a divorce, upon its face, is a mere controversy between the parties to the record, yet the public occupies the position of a third party. Society has an interest in every marriage, and it is the duty of the State, in the conservation of the public morals, to guard the relation, and to see that the status of all applicants for its dissolution should be established."

The considerations which have been mentioned make it clear that it is the duty of the applicant in an *ex parte* proceeding for divorce, on pain of obtaining an invalid decree, to avoid practicing any deception on the court in any matter affecting its jurisdiction or its discretion to proceed or not to the final determination of the cause.

Without reference to the evidence, it is shown by the pleadings, as before in part stated, that before the suit in South Dakota was begun appellant appeared as a defendant in response to the service of summons in this cause and answered appellee's bill. She knew that it was charged in said bill that she voluntarily and without any cause whatsoever left and abandoned her home and appellee in pursuance of a concerted plan and conspiracy between herself and the co-respondent, Allyn, and went to the place in South Dakota where her suit was subsequently begun, for the purpose of obtaining a residence there, so as, if possible, to obtain a divorce, and had in advance retained counsel and had prepared a formal complaint for divorce containing false and fictitious charges against appellee, and that said Allyn, on said trip, passed under the name of Boyle, the brother of appellant, and that she then in South Dakota repeatedly committed adultery with said Allyn, and that she still continued her pretended and assumed residence in South Dakota. She

knew also, of course, that she had answered and denied each and all of these allegations, and had set up and alleged her separation from appellee and her departure from the State for his fault; that she intended to, and did, change her residence to South Dakota and was then residing there; that she had also set up in her answer the same grounds for the separation as a defense to the bill which she afterward alleged in her complaint for a divorce in South Dakota. There were questions of property rights raised by the bill which she had also answered. She had also asked and been refused temporary alimony and counsel fees in this suit. Yet it does not appear from the record of the proceedings in the South Dakota court set up in the cross-bill, nor by any allegation in the cross-bill, that she made any disclosure to that court of any of these proceedings, and it must be presumed, from the record and upon demurrer to the cross-bill, that she did not, for it is a well established rule of pleading that each party's pleading is to be taken most strongly against himself and most favorably to his adversary. (*People* v. *Order of Foresters, ante,* on p. 86; *Groff* v. *Ankenbrandt,* 124 Ill. 51.) Did good faith require her to make such disclosure?

It is well settled that, as between different courts in the same State having concurrent jurisdiction, the one first obtaining jurisdiction of the cause will retain it until the matter is disposed of, and that the prior suit may be pleaded in abatement to the second suit. (*Gindele* v. *Corrigan,* 129 Ill. 582; *Howell* v. *Moores,* 127 id. 67; *Plume & Atwood Manf. Co.* v. *Caldwell,* 136 id. 163; *Mason* v. *Piggott,* 11 id. 85; 1 Ency. of Pl. and Pr. 750.) It is also settled in this State, and we think the general doctrine is, and in the absence of any proof as to the law of South Dakota in this regard the court will assume, that the pendency of the prior suit in this State could not have been pleaded in abatement or in bar to the suit afterward brought in South Dakota. *McJilton* v. *Love,* 13 Ill. 486; *Allen* v. *Watt,*

69 id. 655; 2 Bishop on Marriage, Div. and Sep. secs. 188, 1591, 565; *Bank of North America* v. *Wheeler*, 73 Am. Dec. 688, note; 1 Ency. of Pl. and Pr. 764.

The result would therefore appear to be, that as a matter of strict legal right, no deception being practiced upon the court and jurisdiction assumed, appellant would have had the right to proceed with her suit in South Dakota and to make her defense in this case at the same time. She did not commence the suit in Illinois, nor did she ask for an affirmative decree of divorce by way of cross-bill. She surely had the right to defend against this suit and to defend her character against the severe charges made against her. She had also the clear right to defend her property rights attacked by the bill. It was, however, the jurisdiction in which she had passed her married life with appellee, and where the alleged misconduct of appellee, set up in her answer by way of recrimination and in her complaint as grounds for divorce, took place. Still, it cannot be said that the South Dakota decree could be denied validity on this ground. At the same time and by the same legal principles appellee could not have appeared and successfully pleaded in the South Dakota court the pendency of the prior suit in this jurisdiction in bar or in abatement of her suit there, and it could not well be contended that any duty was imposed on him to enter his appearance in a foreign court to either contest the same issue which was already pending in the court of his own State, in which both parties had appeared, or to endeavor to obtain a stay of proceedings in such foreign suit until the prior suit was determined. He had not been served in South Dakota, and he was not bound to appear there at the risk of suffering a decree good not only as a dissolution of the marriage, but *in personam* also. It has, however, been held that in such a case the court in the State where the second suit is brought may, in its discretion, stay the proceedings there pending until the prior suit is determined.

(1 Ency. of Pl. and Pr. 770, and cases cited in note. See, also, 23 Am. & Eng. Ency. of Law, 523.) It is also true that in actions strictly *in rem*, where one court has obtained possession of the *res* sought to be reached, the process of other courts must pause until that possession be terminated. (*Allen* v. *Supervisors*, 11 Wall. 136.) While this rule is not strictly applicable to divorce cases, yet, such cases being regarded as to some extent *in rem*, an additional reason appears why, in such cases, the court in which the second suit is brought would stay the proceedings unless the rights of citizens of its own jurisdiction would be thereby prejudiced. And this would seem to be the only way to avoid a serious conflict of jurisdiction in such a case, and would evince such a spirit of forbearance and respect for the authority of the courts of a sister State whose jurisdiction had first attached, as might well be expected would be shown by the courts of the several States in the administration of justice under circumstances of so complicated a character. But the circuit court of South Dakota was not afforded any opportunity for the exercise of this discretion. By the concealment of appellant that court had no knowledge that the very questions it was called upon to try in an *ex parte* proceeding were then at issue and pending in a prior suit in the State where both parties had been domiciled and where both had appeared. More than this, it was denied the knowledge that the very facts upon which its jurisdiction depended were then at issue in such prior suit.

While the question is one not free from difficulty, we are of the opinion that appellant failed to act in good faith to the court in which her suit was brought in South Dakota, that she was guilty of fraud upon the court and upon the public in obtaining her decree, and that it is therefore void. It would certainly be an anomaly in legal procedure if a party to a divorce suit pending here, and in view of all the facts disclosed by this record, could, in an *ex parte* proceeding commenced later in time, obtain

a decree in another State and make use of it to oust the jurisdiction of the courts of this State, or, rather, to bar their further proceedings in the cause. We do not say that such a result might in no case be reached, for it must be admitted that if, after such disclosure to the court of South Dakota as we hold it was the duty of appellant to have made, that court had nevertheless proceeded with the cause to final decree, as it had the power to do if she had been a *bona fide* resident there, it might well be that such final decree could have been pleaded as a bar to the further maintenance of this suit. But that point has not been reached in this case, and in no other of a like character to which our attention has been called. As said by Mr. Justice DICKEY in *Mail* v. *Maxwell*, 107 Ill. 554 (at p. 561): "The exercise of sound discretion by the respective courts in our complicated system of government, and the observance by them of a few simple and just rules, has been such that no serious difficulty has been encountered from such a cause,"—that is, from a conflict of jurisdiction.

Counsel cite and press upon our attention the case of *Jones* v. *Jones*, 108 N. Y. 415, as a controlling one in support of the alleged bar of the foreign decree. But in that case the husband appeared in the later suit commenced by the wife in Texas, and was defeated in that suit on the merits as well as on the question of jurisdiction, and the Court of Appeals of New York rightly held that the Texas decree was a bar to the further maintenance of the suit which the husband had previously brought in New York. We are unable to see how that case has any important bearing on the question here under consideration. The point here is the lack of good faith of appellant to the court in South Dakota, in which she was proceeding for a divorce against her non-resident husband *upon constructive service and without his appearance*, in concealing from that court the pendency in Illinois of this prior suit, in which she had appeared and in which the same facts

were at issue. In the New York case the husband, after he had brought his suit in New York, appeared in the Texas court in the suit there later brought by his wife, and litigated with her her right to a divorce, and was defeated. Had Dunham gone to South Dakota and there contested with his wife her right to a divorce under the laws of that State, it is difficult to see how, in the absence of collusion, the question of her good faith to the court, in the form in which it is here presented, could have arisen at all.

*Turner* v. *Turner*, 44 Ala. 437, is a case having some similarity to the one at bar in respect to the fact that there were two suits pending in different States between the parties at the same time, and that the decree rendered in the one last commenced on substituted service was set up as a bar to the other, but the defense was overruled. The court among other things said: "The Indiana divorce in favor of the husband, Matthew Turner, against his wife, the complainant, may protect him on a charge of bigamy should he marry again in this State. (*Thompson* v. *State*, 28 Ala. 1.) But without stopping to inquire whether it was obtained by fraud, and therefore is vicious on that account, or not, it certainly cannot affect the rights of the complainant except her right in the husband as a husband. If it is valid it unmarries him and sets him free from his marital vows to her. He is no longer the complainant's husband." But the court held that it did not settle her right to alimony, nor to dower, nor to her statutory right of distribution should she survive him, nor to any other pecuniary claim against him; that it was the duty of the State to protect its own citizens within its own borders, and that no obligation of comity is paramount to this duty; and the decree of divorce and for alimony was affirmed. In this case, and in *Stilphen* v. *Stilphen*, 58 Me. 508, (4 Am. Rep. 305,) it seems that in order to preserve and enforce the wife's property rights under the local statutes it was considered that the

court had the power to grant the decree, and which in the latter case was regarded as ancillary.

But whether we are correct or not in holding the South Dakota decree void for fraud, we cannot hold that the decree of the court below should be reversed on account of the alleged erroneous ruling in sustaining the demurrer to the cross-bill, for the reason that, in view of the other issues which were tried and found in favor of appellee, such finding, if correct upon the evidence, rendered the error a harmless one. We have already shown that the facts and circumstances of appellant's alleged removal to South Dakota were put in issue by the bill, answer and replication. The admission of the truth of the allegations of the cross-bill did not admit them as incontrovertible facts in the case incapable of being contradicted on any other issue, but only for the purposes of the demurrer in obtaining an adjudication as to the legal sufficiency of the cross-bill; (*Kankakee and Seneca Railroad Co.* v. *Horan*, 131 Ill. 288; 1 Mod. Eq. Pr. sec. 228;) and had there been no other issue under which the same evidence might have been heard, of the matters set up in the cross-bill, and the evidence had been excluded, then the erroneous ruling in sustaining the demurrer, if any, would have been material. But the court admitted in evidence the record of the Dakota suit and decree on the hearing, —for another purpose, it is true, but admitted it nevertheless, and it is before us in the certificate of evidence, and all the facts and circumstances attending the supposed removal of appellant to and location in the State of South Dakota, and her acts and doings before, at and after such alleged change of residence were before the court and are now before this court; and it is perfectly clear, from the evidence, that the sole purpose of appellant in going to South Dakota was to obtain a divorce from appellee in the shortest possible time and with the least possible trouble and publicity, and that she had no intention of permanently residing there. The question of

the jurisdiction of the South Dakota court is not concluded by its decree but is open to inquiry here, and if it appears that appellant was not a *bona fide* resident of that State, but was in fact and in law a citizen and resident of this State when she commenced her suit there, then the decree of that court would be void. (2 Bishop on Marriage, Div. and Sep. secs. 184, 1545 ; *Lawrence* v. *Jarvis*, 32 Ill. 304.) The courts are not concluded by the findings in the foreign decree on the question of jurisdiction. (2 Bishop on Marriage, Div. and Sep. sec. 184.) It would seem, also, that if lack of jurisdiction in that court appears, from the evidence, under the issue made on the bill and answer in this suit, the decree set up in the cross-bill would be unavailing as a defense. The only ground upon which appellant could complain, so far as we can see, is, that if an issue of fact had been joined on the cross-bill by answer and replication, she might have introduced other evidence than was thought necessary under her answer to the original bill. But when the allegations of the bill and answer, and the evidence under them, are fully considered, it appears clear that the same facts were involved and fully contested by both parties. In an action at law an error in sustaining a demurrer to a good plea becomes a harmless one when the same defense is permitted under another plea. *Parks* v. *Holmes*, 22 Ill. 522; *Rockford Ins. Co.* v. *Nelson*, 65 id. 415.

Taking appellee's own testimony and that given by witnesses called by her, and without considering that of her adversary, the trial court must have been, as we are, convinced of the truth of the allegations of the bill that she fraudulently and without sufficient cause left appellee and this State with the co-respondent, who passed under an assumed name, and took up a pretended and assumed residence in South Dakota for the purpose of procuring a divorce, and also, under such circumstances and attended by such facts as, in the face of her and his explicit denial, tend with great force to show that she,

with said Allyn, then committed adultery. It appears from the testimony of herself and Allyn that they consulted together about the proceedings for a divorce which she had in contemplation, and that each of them wrote letters to attorneys in South Dakota to ascertain the grounds upon and the time within which a decree could be obtained, and that in this consultation she conversed with Allyn about the grounds of her complaint against her husband, which involved her sexual relations with her husband, and were of such a character that it is inconceivable that she could make them known to Allyn or converse with him about them upon any other basis (he not being her professional adviser but only a friendly acquaintance, as she claims, who often accompanied her as an escort,) than that of an unlawful intimacy between them. She employed her counsel in Dakota, as she admits, before she left this State, and had laid before them, by correspondence, the grounds of her complaint and had been advised by them. She left her daughter, of the age of eight years, in charge of a nurse, the witness Moe, at the home she had left and where her husband continued to reside. She leased the home place, which appellee had theretofore conveyed to her, for a period of six months, but as appellee refused to surrender possession the lease proved ineffectual. She had no other business at Canton or Sioux Falls, in South Dakota, whither she went, except to obtain a decree of divorce. She had no relatives there. She had, before the death of her second husband, resided with him in South Dakota, but in another part of the State. She testified that in a conversation with her husband about obtaining a divorce she told him that if she went to Dakota she would get it on the least grounds possible; that while she and her husband were consulting about the law of Illinois relating to divorce, with a Chicago lawyer who had acted as counsel for both in other matters, and after she was advised that she could not obtain a divorce in this State

on the grounds stated by her to the attorney, she then said: "If I cannot get a divorce on striking and on different things that I have stated, I think I had better go to Dakota. He advised me to go to Dakota to save notoriety, and I went." Mrs. White, a witness called by appellant, testified that a few days before appellant left for Dakota she called on witness and her sister, Mrs. Mitchell, to bid them good-by, and appellant then said she was going to Dakota to get a divorce from her husband. True, when appellant testified in this case some nine months after she obtained the decree in Dakota, she was still in Sioux Falls and was keeping house there, whither Allyn had also gone,—for business reasons and to be near appellant, as he testified. But little importance, however, can be attached to the fact that she remained in Dakota until after the trial of this cause, for had she not done so there would hardly have appeared on such trial, where she had every reason to expect the validity of the Dakota decree would be challenged, even a semblance of her having been a *bona fide* resident of that State when her suit was begun. Many other circumstances in evidence, which cannot be set out here, strengthen the conclusion we have reached, that appellant went to South Dakota, not for the purpose of becoming a *bona fide* resident there, but only to obtain a divorce from her husband and to have better opportunities for enjoying the society of Allyn, and with the purpose of returning to this State when she should be finally divorced. No other conclusion can be fairly reached, even from the evidence given by herself and her own witnesses. Such being our view, the alleged error in sustaining the demurrer to the cross-bill becomes immaterial in the decision of the case, for the court, when it rendered the decree set up in the cross-bill, had no jurisdiction over appellant and her status as a married woman, and its adjudication was void.

We do not ignore the contention of counsel and the authorities they cite, (*Colburn* v. *Colburn,* 70 Mich. 647, and others,) that a party may have as his main purpose in changing his residence the obtaining of a divorce, and that the mere fact that he is influenced in his choice by the liberality of the laws relating to divorce of the State to which he removes will not destroy the *bona fide* character of his residence in such State, where it appears that he intended, in good faith, to make such residence permanent. But we do not find this to be a case of that character, but do find that appellant's only motives in going to Dakota were those hereinbefore stated.

The only question remaining to be considered is the sufficiency of the evidence to support the findings of the decree that appellant committed adultery with Allyn, as alleged in the bill,—and this has, to some extent, been noticed necessarily in what has already been said. It is not claimed there was any collusion between appellant and appellee, yet we find them in mutual consultation with an attorney in Chicago, before appellant's departure from the State, as to whether or not either of them had sufficient grounds for divorce; but this was before appellee had any reason to suspect his wife of infidelity, and the conference seems to have been invited by her. We think it is apparent, also, that appellee knew that his wife had the intention of going to South Dakota to obtain a divorce from him, for, although estranged, they were still living in the same house but occupying separate apartments, and the matter of their domestic infelicities was at times the subject of brief discussions between them. But he was not consulted as to her plans, nor about the preparation she had made to carry them out, nor did he know that Allyn was to accompany her; but it is clear, beyond controversy, that as the gulf between her and her husband widened the intimacy between her and Allyn increased, and continued to increase in spite of appellee's remonstrances made to both of them.

We do not understand counsel for appellant to claim that a recriminatory defense was established, for although she charged him with adultery in her answer, no sufficient proof thereof was made or attempted, and if the evidence is sufficient to sustain the charge of adultery against her the decree must be affirmed.

In view of the many questions presented and the volume of the evidence no extended review of the evidence will be attempted, but we have carefully considered it all, and we are unable to reach any other conclusion than that to which the trial court was driven. Viewing the entire association between appellant and Allyn, from its commencement in a casual acquaintanceship through its growth and final culmination in the strongest attachment, when they "agreed to stand together" while she was still the wife of appellee, she having proceeded so far, even before she went to Dakota, that she could confide in him the secrets of her sexual relations with her husband, we are led to the conclusion that the many secret meetings which the evidence fairly shows, as we think, took place between them under circumstances not consistent with innocence, were not left unimproved, notwithstanding their denials of guilt. One or more of these meetings is or are explained, but while the explanation shows there was no opportunity for illicit intercourse, it shows also the closest intimacy, and an utter disregard of the only construction which, from their observation and experience in life, (she having already been married thrice and he twice, and each once divorced for the fault of some one else,) they must have known would be placed upon their conduct. We forbear to comment upon the testimony of a negro woman serving at Mrs. Mitchell's, where appellant and Allyn met each other, and of the night clerk in the hotel at Canton, which, if true, afforded direct proof of guilt,—forbear because contradicted by both appellant and Allyn, and by others also, (who, however, were not without interest in their deni-

als,) and because of some circumstances appearing which may have induced mistake or exaggeration. The testimony of the witness Gemmill, that, being on the same train with appellant and Allyn on the trip to South Dakota, he saw her resting her head for a considerable time on Allyn's shoulder, is also denied by both, and inferentially by the conductor and brakeman of the train. But she and Allyn had met clandestinely at the train. The purpose of her going was to obtain a divorce at a place remote from her own jurisdiction and from the place of the happening of the alleged grounds of her separation from her husband and of the residence of the witnesses. They both knew that their previous association had provoked the remonstrances of her husband. They had made previous preparations for the journey without the husband's knowledge. Although going to permanently change her residence she had left her daughter behind. Although each had acquaintances in South Dakota and he a relative whom he desired to visit, they did not visit them but went elsewhere. On their arrival they took connecting rooms at a hotel, he being satisfied, although it was midwinter, that she had a stove with a fire in it in her room while he had none. Her name was registered correctly, but at her request he registered under the name of her brother, and both as from South Dakota. Such undisputed facts make the occurrence testified to by Gemmill entirely probable, without considering many others of a more pointed character but which are within the region of controversy. Afterward, and before her suit had been begun in South Dakota, Allyn loaned her $1500, and later still $500 more with which to pay her expenses; and to pay her the first mentioned sum, instead of giving her the money at the bank of which he was vice-president and where he transacted business, they met by appointment at a hotel in Chicago, where they dined together in the evening.

It cannot, of course, be claimed these last mentioned circumstances alone demonstrate the truth of the charge of adultery. They are evidence of interest and attachment, but by no means necessarily of guilt. But when the whole of the evidence is considered we are of the opinion the charge is sustained. It was said in *Bast* v. *Bast*, 82 Ill. 584: "As to the testimony in all such cases, it must generally be circumstantial. The fact of adultery is to be inferred from circumstances that naturally lead to it by a fair inference, as a necessary conclusion. The direct fact of adultery can seldom, or ever, be proved." And in *Daily* v. *Daily*, 64 Ill. 329: "There is much testimony tending to establish the truth of the charge, but, as in all or nearly all such cases, there is no direct and positive evidence of the acts charged. In such cases the parties generally use every effort to conceal the act, and courts and juries are compelled to determine the question from the behavior of the parties and from a great variety of circumstances, either of which, when considered alone, would be insufficient to prove the charge, but when considered together &ast; &ast; &ast; convince the mind that the charge is true. If direct, positive evidence should be required but few divorces would be obtained on this ground." And in *Moller* v. *Moller*, 115 N. Y. 466: "The illicit amours of faithless husbands and wives are usually clandestine, and their wicked paths are hidden from public observation, and hence courts must not be duped, and they must take such evidence as the nature of the case permits,—circumstantial, direct or positive,— and bring to bear upon it the experiences and observations of life, and, thus weighing it with prudence and care, give effect to its just preponderance."

Appellant and the co-respondent may be innocent of this serious charge, as contended by her able and faithful counsel; but courts must decide questions of fact from the evidence, and parties have only themselves to

blame when, by their conduct, they furnish the evidence for their own condemnation.

Believing the record to be free from error, or at least from harmful error, the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*